OPINION
{¶ 1} Defendant-appellant Theodore Terlesky appeals from his conviction entered in Mahoning County Court No. 4 for gambling, a violation of R.C. 2915.02(A)(2); operating a gambling house, a violation of R.C. 2915.03(A)(1); possession of criminal tools, a violation of R.C.2923.24(A)(1); and public gaming, a violation of R.C. 2915.04(B). Two issues are raised in this appeal. The first issue is whether the trial court erred in failing to suppress the evidence taken as a result of the search warrant. The second issue is whether there was sufficient evidence to support the convictions. For the reasons expressed below, the trial court's denial of the suppression motion and the convictions for gambling, operating a gambling house, and public gaming are affirmed. However, the conviction and sentence for possession of criminal tools is reversed and vacated.
 STATEMENT OF CASE AND FACTS {¶ 2} On March 12, 2005, officers from the Austintown Police Department searched the premises of Theodore's Banquet Center and T G Lounge (collectively referred to as Theodore's) located at 1400 and 1404 Niles Canfield Road, in Mahoning County, Ohio. The search was performed pursuant to a search warrant.
 {¶ 3} The warrant was obtained because police, during routine patrol, had noticed an excessive number of cars in Theodore's parking lot after business hours. The officer proceeded to investigate. He looked through a window that was partially blocked by a piece of cardboard and observed men standing around a table holding money and one man picking the money up from the table after every pass of the dice. The officer believed the men were playing a dice game. The officer continued to observe the same activity over the next two months; the activity occurred on weekends after the hours of operation from about 3:00 a.m. until 5:30 a.m. The affidavit submitted to obtain the search warrant stated that given the dates the officer saw this occurring, he believed that illegal dice games would occur at Theodore's during the weekend of March 11-13, 2005. Given that information, the judge issued the search warrant.
 {¶ 4} On the day of the search, police entered the facility and arrested nine people and charged them with various gambling offenses. The dice game being played on that night was Barbutt. Terlesky was one of the nine people charged. His charges consisted of one count of gambling, a violation of R.C. 2915.02(A)(2), a first-degree *Page 3 
misdemeanor; one count of operating a gambling house, a violation of R.C. 2915.03(A)(1), a first-degree misdemeanor; one count of possession of criminal tools, a violation of R.C. 2923.24(A)(1), a first-degree misdemeanor; and one count of public gaming, a violation of R.C.2915.04(B), a minor misdemeanor.
 {¶ 5} Terlesky moved to suppress the evidence by filing a suppression motion. Following a hearing, the trial court found the search warrant was proper and thereby overruled the motion to suppress.
 {¶ 6} The case proceeded to trial. Following trial, the court found Terlesky guilty on all charges. On the gambling charge, he was sentenced to 180 days in jail with 120 suspended and the remaining 60 days to be served pursuant to electronic monitored home arrest (EMHA). He was fined $250 plus costs. On the operating a gambling house charge, he was sentenced to 180 days in jail with 120 days suspended and the remaining 60 days to be served at EMHA. He was fined $250 plus costs. On the possession of criminal tools charge, he was sentenced to 180 days in jail with 120 suspended and the remaining 60 days to be served at EMHA. He also received 12 months probation and was fined $250 plus costs. Lastly, on the public gaming charge, he was required to pay costs within 30 days. The above sentences were ordered to be served concurrently. All monies were ordered forfeited to the Austintown Police Department. Terlesky appeals from the sentence and conviction.
 FIRST ASSIGNMENT OF ERROR {¶ 7} "THE COURT ERRED IN FAILING TO SUPPRESS ANY AND ALL EVIDENCE TAKEN AS A RESULT OF THE ISSUANCE OF THE SEARCH WARRANT SINCE THE WARRANT LACKED THE REQUISITE PROBABLE CAUSE AND THE EVIDENCE AND THE ARREST IS UNLAWFUL."
 {¶ 8} Terlesky argues the trial court erred in failing to suppress the evidence obtained during the search warrant. He contends that the information in the affidavit upon which the search warrant is based was obtained through an illegal search of Theodore's. He asserts that the police had no right to go onto Theodore's property and look through the window without a search warrant. Thus, in his opinion, the search warrant was not based upon the requisite probable cause.
 {¶ 9} The state counters the above argument by making two points. First, it contends that Terlesky does not have standing to argue that the police needed a search warrant to look in the windows or to even challenge the legality of the search *Page 4 
warrant. Second, the state argues that the police had the authority to look through the windows, and as such, the warrant was based upon sufficient probable cause and did not constitute an illegal search or seizure.
 {¶ 10} Appellate review of a decision on a motion to suppress evidence presents mixed questions of law and fact. United States v. Martinez
(11th Cir.1992), 949 F.2d 1117, 1119. At a suppression hearing, the trial court assumes the role of trier of fact, and as such, is in the best position to resolve questions of fact and evaluate witness credibility. State v. Carter, 72 Ohio St.3d 545, 552, 1995-Ohio-104. As such, a reviewing court must accept a trial court's factual findings if they are supported by competent, credible evidence. State v.Guysinger (1993), 86 Ohio App.3d 592, 594. The reviewing court then applies the factual findings to the law regarding suppression of evidence. An appellate court reviews the trial court's application of the law de novo. State v. Anderson (1995), 100 Ohio App.3d 688, 691.
 {¶ 11} Due to the dispositive nature of the argument, the standing argument will be addressed first.
 A. Standing Argument {¶ 12} It is a fundamental principle of Fourth Amendment law that "[o]nly those whose personal rights have been violated can raise Fourth Amendment claims. State v. Coleman (1989), 45 Ohio St.3d 298, 306. Fourth Amendment rights are personal in nature, and thus, cannot be vicariously asserted by others. Alderman v. United States (1969),394 U.S. 165, 174; Rakas v. Illinois (1978), 439 U.S. 128, 133-134;Coleman, 45 Ohio St.3d at 306. A defendant bears the burden of proving not only that the search was illegal, but also that he had a legitimate expectation of privacy in the area searched. See Rawlings v.Kentucky (1980), 448 U.S. 98, 104.
 {¶ 13} The state contends that since Terlesky did not own the property that Theodore's sits on, he has no standing to claim that an illegal search of that property occurred. The state supports this claim by stating that Betty Garhammer, Terlesky's sister, owns the land Theodore's sits on.
 {¶ 14} The state's argument concentrates on testimony admitted at trial from Garhammer indicating that she owns the real estate that Theodore's sits on. Moreover, Garhammer indicated she pays the real estate taxes on Theodore's. (Trial Tr. 141). However, Garhammer also indicated that Terlesky is her silent partner. (Trial Tr. 144). She stated that while he does not get paid and he is not permitted to do anything in the *Page 5 
business, he does have keys to the establishment. (Trial Tr. 144). She explained that in the beginning when she first started the business he gave her money to help start it. (Trial Tr. 146). She also explained that his name is also on the liquor license. (Trial Tr. 146). She stated that he did not sell his interest to her and that he is still a partner, but that he does not own the building anymore. (Trial Tr. 146). Furthermore, an officer testified that in getting the search warrant he determined that Terlesky was on the liquor license.
 {¶ 15} Information disclosed during the suppression hearing also indicated that Garhammer owns the real estate that Theodore's is located on, but that Terlesky is a part owner in the business. While the affidavit supporting the search warrant set forth that Garhammer owned the real estate, other testimony indicated that Terlesky was a part owner of Theodore's. When Terlesky's counsel cross-examined the officer, the questions Terlesky asked suggest that Terlesky is an owner of Theodore's. For instance, one question by Terlesky was "did you have anybody with you when you were on my client's property" and "did any one ask you to be on my client's property". (06/23/05 Tr. 24). Furthermore, it also came out on cross-examination that Terlesky applied for a liquor permit for Theodore's. (06/23/05 Tr. 26).
 {¶ 16} Given all the above information and the fact that nothing in the record reputes the indication that Terlesky is at least a part owner, he does have standing to raise an issue with the validity of the search warrant. His business was searched, thus, possibly his rights were violated. Consequently, the state's first argument fails.
 B. Authority to Look Through the Window Without aWarrant {¶ 17} Terlesky contends that his Fourth Amendment rights were violated when the police looked through the window of Theodore's without first obtaining a search warrant. He argues that Theodore's is located on private property and he had a reasonable expectation of privacy. He would maintain that looking through the window constituted an illegal search and thus a violation of his Fourth Amendment Rights. He cites toCity of Cleveland v. Boumis (May 19, 1977), 8th Dist. No. 36183, to support this position.
 {¶ 18} "The Fourth Amendment protects the individual's actual and justifiable expectation of privacy from the ear and eye of the government. See, generally, Smith v. Maryland (1979), 442 U.S. 735,740-741; Katz v. United States (1967), *Page 6 389 U.S. 347, 351. If the state wishes to intrude on the individual's right to be secure in his person, house, paper, and effects by searching or seizing him or his things, the state must first secure a warrant. Section 14, Article I, Ohio Constitution." State v. Buzzard, 112 Ohio St.3d 451,2007-Ohio-373, ¶ 13.
 {¶ 19} The Ohio Supreme Court has further explained that: "Modern understandings of the Fourth Amendment recognize that it serves to protect an individual's subjective expectation of privacy if that expectation is reasonable and justifiable. Rakas v. Illinois (1978),439 U.S. 128, 143; Katz v. United States (1967), 389 U.S. 347, 361 (Harlan, J., concurring)." Buzzard, 112 Ohio St.3d 451, 2007-Ohio-373, ¶ 14.
 {¶ 20} As stated above, Terlesky cites to Boumis to support his contention. In Boumis, officers peered through the window of a private residence and observed what they believed to be gambling. The officers pounded on the front door and when opened, the officers arrested the men that were allegedly gambling including Boumis who was the owner of the home. Evidence, e.g. playing cards, was seized that night, which Boumis subsequently asked the trial court to suppress the evidence. The court suppressed the evidence and the state appealed. The Eighth Appellate District upheld the trial court's suppression of the evidence. It explained:
 {¶ 21} "A police officer's unlawful physical trespass upon one's private dwelling property precludes the admissibility of evidence seen, heard, or subsequently seized, since such conduct violates the Fourth Amendment. Johnson v. State (1967), 2 Md.App. 300, 234 A.2d 464;Commonwealth v. Hernley (1970), 216 Pa.Super. 177, 263 A.2d 904. Moreover, the police officers' conduct in trespassing upon appellee's property and peering through a crack between the curtained windows is a clear and inexcusable violation of appellee's reasonable expectation of privacy. Katz v. United States, supra." Boumis, 8th Dist. No. 36183.
 {¶ 22} Terlesky claims that the only difference betweenBoumis and the case at hand is that Boumis was not a search warrant case. Terlesky is correct that that is one difference between the two cases, however, it is not the only difference. More importantly,Boumis dealt with a private residence. Theodore's is not a private residence, it is a banquet hall and lounge that has a liquor license. (Trial Tr. 141). Furthermore, when the officer drove past Theodore's and observed 10 cars in the *Page 7 
parking lot, it was past 2:30 a.m. This was after Theodore's business hours and liquor is not permitted to be served after 2:30 a.m.
 {¶ 23} Those facts make Boumis distinguishable. The expectation of privacy in a banquet hall and lounge that is open to the public and that holds a liquor license is less than the expectation of privacy in one's own residence. The expectation of privacy for businesses that have been "pervasively regulated" is reduced. City of Strongsville v. Patel, 8th Dist. Nos. 84736, 84751, 84754, 84749, 84752, 84750, 84753,2005-Ohio-620, citing, United States v. Biswell (1972), 406 U.S. 311,316; Colonnade Catering Corp. v. United States (1970), 397 U.S. 72, 77. A few examples of such businesses are places serving alcohol, pharmacies, and horse racing. AL Post 763 v. Ohio Liquor ControlComm., 82 Ohio St.3d 108, 112, 1998-Ohio-367 (stating that the reasonable expectation of privacy in liquor permit premises is minimal because permit holders, regardless of permit class, consent to inspection of the premises by authorized agents through the provision of the Liquor Control Act and accompanying administrative rules and regulations); Burneson v. Ohio State Racing Com'n., 10th Dist. No. 03AP-925, 2004-Ohio-3313 (horse racing pervasively regulated).
 {¶ 24} Moreover, the Ohio Supreme Court's recent decision inBuzzard is more analogous to the case at hand, than Boumis. InBuzzard, the Court was determining whether the Fourth Amendment required the police to obtain a warrant before looking through a small opening in a locked double door of a residential garage. The Court determined that it did not. It explained that the actual subjective expectation of privacy must be counterbalanced by objective reasonableness.Buzzard, 112 Ohio St.3d 451, ¶ 20. It explained that the detective had followed the tracks from the scene of the burglary directly to the doors of the garage. It then stated that nothing before it suggested that the garage was used by appellee for any "intimate activity associated with the `sanctity of a man's home and the privacies of life.'" Id.
 {¶ 25} If an officer was permitted to look through the crack in a residential garage door without violating the homeowners Fourth Amendment Rights, it stands to reason that the officer in the situation presented in the case at hand did not violate Terlesky's Fourth Amendment Rights when he looked through a window at Theodore's. Considering the public nature of Theodore's and the type of business it is, subjective expectation of privacy counterbalanced by objective reasonableness *Page 8 
indicates there was no Fourth Amendment violation. Accordingly, this assignment of error lacks merit.
 SECOND ASSIGNMENT OF ERROR {¶ 26} "THE COURT ERRED IN FINDING TERLESKY GUILTY OF GAMBLING, OPERATING A GAMBLING HOUSE, PUBLIC GAMING AND POSSESSION OF CRIMINAL TOOLS SINCE THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH GUILT BEYOND A REASONABLE DOUBT."
 {¶ 27} Terlesky raises both sufficiency arguments and manifest weight of the evidence arguments under this assignment of error. A review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct determinations. State v.Gulley (Mar. 15, 2000), 9th Dist. No. 19600. "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." Id., citingState v. Thompkins, 78 Ohio St.3d 380, 390, 1997-Ohio-52.
 {¶ 28} In order to find a conviction was supported by sufficient evidence, this court must review the evidence in a light most favorable to the prosecution. State v. Jenks (1991), 61 Ohio St.3d 259, 279. In contrast, where an appellate court reviews a claim that a verdict is against the manifest weight of the evidence, the court sits as a "thirteenth juror" and either agrees or disagrees with the fact finder's resolution of conflicting testimony. Thompkins, 78 Ohio St.3d at 387. An appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Id.
 {¶ 29} The first charge addressed is the gambling charge, a violation of R.C. 2915.02(A). This statute prohibits a person from knowingly engaging in conduct that "facilitates any game of chance conducted for profit or any scheme of chance." The statute states that for purposes of division (A)(2), "a person facilitates a game of chance conducted for profit or a scheme of chance if the person in any way knowingly aids in the conduct or operation of any such game or scheme, including, without limitation playing any such game or scheme." R.C. 2915.02(B). *Page 9 
 {¶ 30} It is undisputed that Barbutt was the game being played that night at Theodore's. Consequently, Barbutt must either be a "game of chance conducted for profit" or a "scheme of chance."
 {¶ 31} Both of these phrases are defined in R.C. 2915.01. A game of chance is defined as "poker, craps, roulette, or other game in which a player gives anything of value in hope of gain, the outcome of which is determined largely by chance, but does not include bingo." R.C.2915.01(D). A scheme of chance includes slot machines, lottery, numbers games, pools conducted for profit. R.C. 2915.01(C). Barbutt would fall under the definition of game of chance.
 {¶ 32} However, the element requires it be a game of chanceconducted for profit. R.C. 2915.01(E) defines "game of chance conducted for profit" as "any game of chance designed to produce income for the person who conducts or operates the game of chance, but does not include bingo." The word "conduct" is also defined by statute. It means "to back, promote, organize, manage, carry on, sponsor, or prepare for the operation of bingo or a game of chance." R.C. 2915.01(T).
 {¶ 33} Considering all of these definitions, the state was required to prove that Terlesky knowingly engaged in conduct that facilitated the game of Barbutt, which was being played for the profit of the house/dealer. The two elements which Terlesky claims cannot be found are that Terlesky facilitated the game and that the game was "conducted for profit."
 {¶ 34} The testimony shows that Terlesky was at Theodore's on March 12, 2005, while Barbutt was being played. (Trial Tr. 30-31). The officer testified that from his observation of Terlesky he was acting as a lookout. (Trial Tr. 49, 67). Furthermore, the officer testified that he believed that Terlesky operated Theodore's. (Trial Tr. 24). He explained that he had previous dealings with Terlesky in his capacity as a liquor agent, which included official documents and licenses, that led him to believe that Terlesky ran Theodore's. (Trial Tr. 69-70). The officer also testified that it was Terlesky who led the officers to the back office of Theodore's where the ledger was found, which allegedly showed that illegal gambling was occurring on the property.
 {¶ 35} Garhammer testified that Terlesky is her silent partner. (Trial Tr. 144). She testified that Terlesky does not get paid and he is not permitted to do anything in the business, but he does have keys to the place. (Trial Tr. 144). She further testified that his name is on the liquor license. (Trial Tr. 146). *Page 10 
 {¶ 36} The above testimony is sufficient to show that Terlesky "knowingly engaged in conduct that facilitated" the game of Barbutt. The officer's indication that Terlesky was acting as the lookout, the fact that Terlesky was the person that led the police into the back office so that it could be searched, and that Terlesky was part owner of the business and had keys was sufficient evidence to show he facilitated the game. In State v. Young (1983), 13 Ohio App.3d 91, the Second District Court of Appeals held that an employee's knowledge of the presence of a blackjack machine in a bar where she was employed, along with her act of dispensing quarters for use in the machine was sufficient to prove beyond a reasonable doubt that she knowingly engaged in conduct to facilitate the game. That case supports the conclusion that the evidence, when viewed in the light most favorable to the state, was sufficient to show that Terlesky knowingly engaged in conduct to facilitate the game of Barbutt.
 {¶ 37} However, as stated above, in order for a gambling conviction to be obtained, the game of Barbutt was required to be conducted for profit, meaning the person operating the game must have profited, i.e. the house/dealer got a cut.
 {¶ 38} One of the state's witnesses was Donna Merrill. She was at Theodore's on the night in question and explained that people, including her, were playing Barbutt that night. (Trial Tr. 96, 100-104). She indicated that she did not have to pay an entrance fee to play. (Trial Tr. 108).
 {¶ 39} Donna testified that she lost that night, however, she explained that if she won she could "tip" somebody if she wanted. (Trial Tr. 106-107, 113). Or, in other words, she could tip the dealer/house. She testified that the dealer did not get a cut per se. (Trial Tr. 113). In explaining this, she testified as follows:
 {¶ 40} "Q. [Prosecutor] Okay. There is a cut to the dealer; is that correct?
 {¶ 41} "A. [Donna] What do you mean a cut?
 {¶ 42} "Q. Is there a five percent cut for the dealer, or for the house?
 {¶ 43} "A. You can, you give them, you know, —
 {¶ 44} "Q. What's the usual standard, percentage?
 {¶ 45} "A. Just like going to a restaurant, you given them a, $2, $1. You can give them $1; you can give them two, you know, $20, you don't give them nothing.
 {¶ 46} "Q. What is the usual percentage, ma'am?
 {¶ 47} "* * * *Page 11 
 {¶ 48} "A. Some of the games they do three to five. I didn't pay any rake that night so I can't say?" (Trial Tr. 112-113).
 {¶ 49} However, she explained that she did not see anybody pay a rake that night because she was sitting down or drinking coffee. (Trial Tr. 113-114). She stated that she does not know who paid a rake that night, but she is sure somebody did. (Trial Tr. 115). She said that if a rake is paid, then the dealer puts the money in the box on the table. (Trial Tr. 114). She also testified that the rake could go to pay for the food for the night. (Trial Tr. 127).
 {¶ 50} Another woman, Twila Borrell, who was there that night, also testified. When asked about the house's cut, i.e. paying a rake, she stated:
 {¶ 51} "Q. [Prosecutor] There were winners and there were losers; is that correct? Is there someone who gets a percentage or cut?
 {¶ 52} "A. [Twila] (Inaudible.)
 {¶ 53} "Q. You don't know anything about the cut?
 {¶ 54} "A. I don't know about it; I don't care about it. I don't care what they do. I just wanted to play.
 {¶ 55} "Q. All right. And did you play?
 {¶ 56} "A. Yes, I did.
 {¶ 57} "Q. And did you have to tip anybody to play?
 {¶ 58} "A. You can tip.
 {¶ 59} "Q. I didn't ask you that.
 {¶ 60} "A. If you're winning you can tip. If your winning you can pay; they take it towards food.
 {¶ 61} "Q. As far as you know?
 {¶ 62} "A. Right as far as I know. I don't care what they —." (Trial Tr. 175-176).
 {¶ 63} Twila further testified that she did not tip anybody that night and she did not pay attention to whether anyone else was tipping. (Trial Tr. 176).
 {¶ 64} One of the last witnesses to testify was Officer Solic, the inventory officer. (Trial Tr. 197). His testimony was offered to try to show that the ledger was used to track the gambling. He testified as follows:
 {¶ 65} "Q. [Prosecutor] Now, from your training, education and experience, have you investigated gambling activities in the past? *Page 12 
 {¶ 66} "A. [Solic] Not gambling but narcotics.
 {¶ 67} "Q. And do people who run —
 {¶ 68} "Mr. Maillis [counsel for one of the co-defendants]: Objection, Your Honor. He said he's never investigated a gambling case before. So if he's going to ask him what that piece of paper is going to be, note my objection.
 {¶ 69} "Judge D'Apolito: (Inaudible.)
 {¶ 70} "Q. And do people who participate in illegal drug activity keep records or notes similar to the ones you see?
 {¶ 71} "Mr. Maillis: Objection.
 {¶ 72} "Unidentified Speaker: Objection. Immaterial. Irrelevant.
 {¶ 73} "Judge D'Apolito: (Inaudible.)
 {¶ 74} "A. (Inaudible.)
 {¶ 75} "Q. Yes, do they?
 {¶ 76} "A. Yes, sir.
 {¶ 77} "Q. Now, the document that — you say came from Victor Maillis?
 {¶ 78} "A. Yes.
 {¶ 79} "Q. Were you investigating narcotic drug activity?
 {¶ 80} "A. At this time, no.
 {¶ 81} "Q. Were you investigating gambling activity?
 {¶ 82} "A. Yes, Sir.
 {¶ 83} "Q. What did you, did you use your experience in narcotics to identify that document used in this gambling activity?
 {¶ 84} "* * *
 {¶ 85} "A. My experience as an investigator would lead me to believe that this ledger is a notation for monies owed.
 {¶ 86} "Q. By the participants?
 {¶ 87} "A. By the individual whose name and number appears that would be my experience that that individual would owe the holder of the ledger that amount of money." (Trial Tr. 199-201).
 {¶ 88} Thus, Solic's testimony, if believed, established that some of the players owed Victor Maillis, the dealer, money. Yet, one attorney asked whether the note indicated any evidence of illegal activity, or in other words if someone had borrowed or *Page 13 
lent money was that illegal. (Trial Tr. 201). The officer testified that to borrow or lend money in and of itself is not illegal. (Trial Tr. 202).
 {¶ 89} No witness testified that the house/dealer definitely got a cut. However, the evidence when viewed in the light most favorable to the state indicates that it did. There is testimony that it is customary that if someone won they would pay a percentage to the house/dealer. When that money was paid, it was put into the box in front of the dealer. Money confiscated from the dealer box on the table was $1,871. Furthermore, there was a ledger that allegedly showed who owed money to the house/dealer. Additionally, this game was occurring after regular business hours at around 3:00 a.m. Likewise, the windows to the business were partially blocked by cardboard. Considering all this, there was sufficient evidence to find that the game of Barbutt was being "conducted for profit."
 {¶ 90} Likewise, considering the evidence, we cannot find that the court clearly lost its way when it found Terlesky guilty of gambling. Admittedly, there was no direct evidence that Terlesky facilitated the game and that Barbutt was being "conducted for profit." However, there was circumstantial evidence. Circumstantial evidence and direct evidence have the same probative value, and in some instances, certain facts can be established only by circumstantial evidence. Jenks,61 Ohio St.3d at 272. Even a conviction that is based solely on circumstantial evidence is no less sound than one based on direct evidence. State v. Begley
(Dec. 21, 1992), 12th Dist. No. CA92-05-076. As the evidence was explained above, it could lead a reasonable person to believe the game was being "conducted for profit" and that Terlesky knowingly engaged in conduct to facilitate the game either by acting as a lookout or by keeping track of money owed. Thus, the conviction for gambling is supported by sufficient evidence and it is not against the manifest weight of the evidence.
 {¶ 91} The next two convictions are operating a gambling house, and public gaming. Operating a gambling house is a violation of R.C.2915.03(A)(1) and prohibits a person from being the owner or lessee, or having custody, control, or supervision of the premises, and using the premises for gambling in violation of section 2915.02 of the Revised Code. Public gaming is a violation of R.C. 2915.04(B) and prohibits a person from being the owner or lessee, or having custody, control, or supervision, of a restaurant, tavern, or hall, and recklessly permit that premises to be used to make a bet or play any game of chance or scheme of chance. *Page 14 
 {¶ 92} As can be seen by the definitions, these two crimes require that it be proven that a game of chance was being played. Above, we found that Barbutt was a game of chance and that it was being played for profit. Thus, the only element that must be found in order to convict under operating a gambling house, and public gaming are that Terlesky was the owner or lessee, or had custody, control or supervision of the hall. We have previously stated that the evidence indicates that Terlesky is part owner of Theodore's. This would be sufficient to support the element of being an owner or lessee, or having custody, control or supervision of the hall. Thus, those convictions were supported by sufficient evidence, and they were not against the manifest weight of the evidence.
 {¶ 93} The last conviction is for possession of criminal tools, a violation of R.C. 2923.24(A). The possession of criminal tools statute prohibits a person from possessing or have under their control "any substance, device, instrument, or article, with purpose to use it criminally." R.C. 2923.24(A).
 {¶ 94} The indictment alleges that the criminal tools were dice, dice tables, rakes and U.S. currency. However, it is noted that the testimony clearly reveals that no money was confiscated from Terlesky's person. Furthermore, there is no indication in the testimony whether the evidence taken from the dealer's box was going to the dealer, Victor Mallis, or the house. However, what was confiscated was dice, dice table, and rakes.
 {¶ 95} While possession of those items might be considered possession of criminal tools, we must note that there is a gambling statute that specifically addresses possession of gambling paraphernalia. It is R.C.2915.02, which states:
 {¶ 96} "(A) No person shall do any of the following:
 {¶ 97} "(1) Engage in bookmaking, or knowingly engage in conduct that facilitates bookmaking;
 {¶ 98} "(2) Establish, promote, or operate or knowingly engage in conduct that facilitates any game of chance conducted for profit or any scheme of chance;
 {¶ 99} "(3) Knowingly procure, transmit, exchange, or engage in conduct that facilitates the procurement, transmission, or exchange of information for use in establishing odds or determining winners in connection with bookmaking or with any game of chance conducted for profit or any scheme of chance; *Page 15 
 {¶ 100} "(4) Engage in betting or in playing any scheme or game of chance as a substantial source of income or livelihood;
 {¶ 101} "(5) With purpose to violate division (A)(1), (2), (3), or (4) of this section, acquire, possess, control, or operate any gamblingdevice." (Emphasis added).
 {¶ 102} R.C. 2915.01 specifically defines gambling device as:
 {¶ 103} "(F) `Gambling device' means any of the following:
 {¶ 104} "(1) A book, totalizer, or other equipment for recording bets;
 {¶ 105} "(2) A ticket, token, or other device representing a chance, share, or interest in a scheme of chance or evidencing a bet;
 {¶ 106} "(3) A deck of cards, dice, gaming table, roulette wheel, slot machine, or other apparatus designed for use in connection with a game of chance;
 {¶ 107} "(4) Any equipment, device, apparatus, or paraphernalia specially designed for gambling purposes;
 {¶ 108} "(5) Bingo supplies sold or otherwise provided, or used, in violation of this chapter."
 {¶ 109} From a plain reading of this statute, the dice, dice cup, rakes, and table would clearly fall under this specific statute.
 {¶ 110} For purposes of our review for sufficiency, this means that the possession of criminal tools conviction should be reversed. The Ohio Supreme Court in State v. Volpe (1988), 38 Ohio St.3d 191, clearly mandates this.
 {¶ 111} In Volpe, appellant was found guilty of possession of criminal tools in violation of R.C. 2923.24 for possessing two "Castle machines," which were gambling machines. Appellant argued he was improperly convicted of possession of criminal tools because R.C. 2915.02(A)(5) was a specific statute that addressed possession of gambling devices, and as such, he could only be charged with that offense and not possession of criminal tools. The Supreme Court agreed and explained:
 {¶ 112} "Well-established principles of statutory construction require that specific statutory provisions prevail over conflicting general statutes.
 {¶ 113} "* * *
 {¶ 114} "R.C. 2915.02(A)(5) and 2923.24 are irreconcilable. R.C.2915.02 (A)(5), in conjunction with R.C. 2915.02(F), treats possession of a gambling device as a first degree misdemeanor. As such, a person convicted of violating R.C. 2915.02 (A)(5) could receive no prison sentence or a prison sentence of up to six months. See *Page 16 
R.C. 2929.21. R.C. 2923.24 makes possession of criminal tools, arguably such instruments as gambling devices, a fourth degree felony, carrying a minimum prison sentence of six months and a maximum prison sentence of five years. See R.C. 2929.11. Therefore, since R.C. 2915.02 and 2923.24
provide for different penalties for the same conduct, they cannot be construed to give effect to both. R.C. 2915.02 and 2923.24 were enacted effective January 1, 1974, as part of the modern Ohio Criminal Code. Therefore, under R.C. 1.51, the general law, R.C. 2923.24, does not prevail as being the `later adoption.' Further, the fact that the General Assembly enacted R.C. 2915.02(A)(5) to reach possession and control of gambling devices indicates that it did not intend for R.C.2923.24 to reach possession and control of such devices.
 {¶ 115} "* * *
 {¶ 116} "Given that the General Assembly clearly enacted R.C.2915.02(A)(5) to reach criminal possession and control of a gambling device and classified such conduct as a misdemeanor of the first degree under R.C. 2915.02(F), we hold that R.C. 2923.24, a general statute prohibiting possession and control of criminal tools and classifying such conduct as a fourth degree felony, cannot be used to charge and convict a person of possessing and controlling a gambling device. Accordingly, we reverse the judgment of the court of appeals and remand these two cases to the trial court for disposition consistent with this opinion." Id. at 193-194.
 {¶ 117} This case clearly indicates that if a person has possession of a "gambling device" then that person can only be charged under R.C.2915.02 and cannot be charged under R.C. 2923.24. As stated above, no money was confiscated from Terlesky; instead only dice, dice cups, rakes and a gambling table were confiscated. As those items clearly fall under the possession of gambling device statute, Volpe is directly on point in this case. In Volpe, appellant's conviction for possession of gambling machines was overturned because he was charged under the possession of criminal tools statute instead of the possession of gambling devices statute. Likewise, in this case, for possession of dice, dice cups, rakes and a gambling table, Terlesky was required to be charged under R.C. 2915.02, the gambling device statute and not R.C. 2923.24, the possession of criminal tools statute. As there was no other evidence confiscated from Terlesky, that would fall under the possession of criminal tools statute, the conviction for possession of criminal tools must be reversed. *Page 17 
 {¶ 118} For the foregoing reasons, the judgment of the trial court regarding the motion to suppress is hereby affirmed. The convictions for gambling, operating a gambling house, and public gaming are also affirmed. However, the conviction for possession of criminal tools is reversed and vacated.
 DeGenaro, P.J., concurs. Donofrio, J., concurs. *Page 1