[Cite as *State v. Johnson*, 2014-Ohio-1226.]

STATE OF OHIO, JEFFERSON COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO. 13 JE 5 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | O P I N I O N |
| | ) | |
| ANTONIO JOHNSON, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |


CHARACTER OF PROCEEDINGS:       Criminal Appeal from Common Pleas
                                Court, Case No. 12CR119.


JUDGMENT:                       Affirmed in part; Reversed and Vacated
                                in part.


APPEARANCES:
For Plaintiff-Appellee:         Attorney Jane Hanlin
                                Prosecuting Attorney
                                16001 State Route 7
                                Steubenville, Ohio  43952


For Defendant-Appellant:        Attorney Eric Reszke
                                Suite 810, Sinclair Building
                                Steubenville, Ohio  43952


JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Mary DeGenaro


                                Dated:  March 24, 2014

VUKOVICH, J.

{¶1}   Defendant-appellant Antonio Johnson appeals his conviction and sentence that was entered in the Jefferson County Common Pleas Court for attempted murder, felonious assault, weapons under disability, improper handling of a firearm in a motor vehicle and the attendant firearm, criminal gang and discharge firearm from a vehicle specifications.   Johnson assigns three errors in this case. First, he argues that the discharge a firearm from a vehicle ("drive-by") specification should be set aside because the evidence introduced at trial did not indicate that he was in the vehicle when he was allegedly shooting the firearm.   Second, he argues that the guilty verdicts for attempted murder and felonious assault are against the manifest weight of the evidence.   Third, he argues that the trial court abused its discretion when it qualified Detective John Lelless as an expert on the issue of criminal gangs.

{¶2}   For the reasons discussed below, the second and third arguments are meritless.   As to the first argument, this argument has merit.   Accordingly, the conviction and sentence for the drive-by specification is reversed and vacated.   All other convictions and sentences are hereby affirmed.

<u>Statement of the Facts and Case</u>

{¶3}   In the afternoon of July 2, 2012, Johnson, aka Smiley, allegedly driving a white car followed a car being driven by Trystn Hampton.   In Hampton's vehicle, De'Lesha Thorn was sitting in the front passenger seat and Stedmund Creech, C.J. and Rolland "Buster" Owens were sitting in the back seat.   It is claimed that when the car being driven by Hampton stopped on Orchard Street, a residential neighborhood, to let Creech, C.J. and Owens out of the car, Johnson used the driver's door as a shield and opened fire at Creech, C.J., and Owens.   He allegedly shot 17 rounds from an AK-47 and Creech, C.J. and/or Owens allegedly returned fire.   Bullets penetrated two different houses, but, fortunately no one was harmed during this mid-day shooting.

{¶4} Allegedly Johnson is a member of the Blue Devil gang, a subset of the Crips. Creech, C.J. and Owens are allegedly members of a rival gang, the Grape Street gang, which is also a subset of the Crips.

{¶5} As a result of those alleged actions, Johnson was indicted for attempted murder, in violation of R.C. 2923.02 and R.C. 2903.02, a first-degree felony; felonious assault, in violation of R.C. 2903.11, a second-degree felony; weapons under disability, in violation of R.C. 2923.13, a third-degree felony; and improper handling of a firearm in a motor vehicle, in violation of R.C. 2923.16, a fourth-degree felony. The attempted murder and felonious assault offenses each contained three attendant specifications - a R.C. 2941.145 firearm specification, a R.C. 2941.142 criminal gang specification, and a R.C. 2941.146 discharge of firearm from a motor vehicle specification ("drive-by" specification).

{¶6} The jury found him guilty of all charges and specifications. 02/07/13 Verdicts. The trial court sentenced Johnson to an aggregate sentence of 24½ years. The attempted murder and felonious assault convictions merged for purposes of sentencing and Johnson received a 10 year sentence. For the firearm specification, he received a mandatory 3 year term. For the gang specification, he received a mandatory 2 year term. For the "drive-by" specification, he received a mandatory 5 year term. For the weapons under disability conviction, he received a 3 year term, and for mishandling a firearm in a motor vehicle he received an 18 month prison term. 02/14/13 J.E.

{¶7} Johnson appeals from his conviction and sentence.

First Assignment of Error

{¶8} "The trial court committed reversible error in overruling appellant's motion to set aside the 'drive by' specifications pursuant to Criminal Rule 33(A)(4)."

{¶9} At the close of the state's case, Johnson moved for an acquittal pursuant to Crim.R. 29. The argument supporting the motion was a general argument that the state did not prove its case. The trial court denied the motion. One day after trial, Johnson filed a timely Crim.R. 33(A)(4) motion to set aside the

conviction for the R.C. 2941.146 "drive-by" specification asserting that the verdict is not supported by sufficient evidence. The trial court also denied that motion.

{¶10} Appellate courts have concluded that when a motion for new trial is based on division (A)(4), the appellate court uses the same standard of review that it does when reviewing a sufficiency of the evidence argument and the denial of a Crim.R. 29 motion for acquittal. *State v. Hogg*, 10th Dist. No. 11AP-50, 2011-Ohio-6454, ¶ 14; *State v. Stephens*, 11th Dist. No. 2001-T-0044, 2002-Ohio-2976, ¶ 26. Thus, as the reviewing court, we must determine whether a rational factfinder, viewing the evidence in a light most favorable to the prosecution, could have found the essential elements were proven, beyond a reasonable doubt. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 687 N.E.2d 541 (1997) (sufficiency standard of review).

{¶11} The "drive-by" specification is found in R.C. 2941.146. Section (A) indicates that a five-year prison term is imposed when a defendant commits a felony that includes the element of purposely or knowingly causing or attempting to cause the death of or physical harm to another, if the crime "was committed by discharging a firearm from a motor vehicle other than a manufactured home."

{¶12} Johnson argues that since he was not in the vehicle when the shots were being fired, the R.C. 2941.146 "drive-by" specification is inapplicable to him. His position is based on the Ohio Supreme Court's decision in *State v. Swidas*, 133 Ohio St.3d 460, 2012-Ohio-4638, 979 N.E.2d 254.

{¶13} In *Swidas*, the Court held that R.C. 2941.146 is not applicable when a defendant is standing outside his vehicle. *Id.* at ¶ 14. In forming the issue presented for it to decide, the Court stated:

> The crux of this case is determining what the word "from" means in the phrase "from a motor vehicle." The court of appeals stated that R.C. 2941.146 is not limited to "drive-by" shootings. But does it apply to a "stand-by" shooting?

*Id.* at ¶ 16.

**{¶14}** In deciding the case, the Court looked at dictionary definitions of the word "from." *Id.* at ¶ 18-19. It explained that those definitions refer to a point or place where something departs. *Id.* at ¶ 20. It then looked at the statute and explained that the point or place is "a motor vehicle;" the statute requires the starting point of the activity to be the motor vehicle itself. *Id.* It then explained:

> But a motor vehicle cannot fire a weapon; the statute applies to people. That does not obviate the statutory requirement that the locus of the discharge of the weapon is the motor vehicle itself. For the locus of the discharge to be the motor vehicle, then, the person discharging the weapon must have a substantial physical connection to the vehicle. If a person were in or on a vehicle to the extent that the vehicle was providing substantial support to the person, the locus of that person's firing of the weapon would be the motor vehicle. Without a substantial physical connection to the vehicle, a shooter cannot be said to have fired a shot that commenced from the motor vehicle.

*Id.* at ¶ 21.

**{¶15}** In the case at hand, testimony from Thorn indicates that Hampton and Thorn were at the Maryland Market when Creech, C.J. and Owens asked them for a ride to "the other side of the hill," meaning the Pleasant Heights section of Steubenville. Tr. 151-153. While en route to their destination, they crossed the Lawson Avenue Bridge and passed a white car that Johnson was allegedly driving; Thorn testified that she knew the driver as Smiley. Tr. 154. They arrived at Orchard Street in the Pleasant Heights section of Steubenville and let the men out of the car. As the men were getting out of the car, Thorn noticed the white car that they passed on the bridge come up behind them. She testified that Smiley got out of the car and using the driver's door as a shield, fired shoots at the men getting out of the car she was in. Tr. 157.

**{¶16}** Her specific testimony as to Johnson's relationship to the car is as follows:

> A. And the individual gets out of the car with a shotgun.

Q. Okay. And could you see the individual who got out of the car with the – what you refer to as the shotgun?

A. Yes, Ma'am.

Q. And who was that?

A. Smiley.

Q. All right. Any doubt in your mind that the individual who got of that white car with the gun is the individual who is seated here in the courtroom today?

A. No, there's no doubt.

Q. Okay. And when you see him this time what do you see?

A. I see him behind like the driver's door with the gun.

Q. When you say behind the driver's door was he behind the driver's door of the car that he had been driving?

A. Yes.

Q. Does – do you ever see him come completely away from the car at all?

A. Like – he's like – it's like a shield. That's how he was with the gun, just behind –

Q. Using his own car door as a shield?

A. Yes.

Q. And he's behind that.

A. Yes.

Tr. 157-158.

{¶17} Testimony also shows that following the shooting, Johnson drove the white car away from the scene of the shooting. Thorn testified that a little after they drove away they saw the white car again and it was wrecked into another vehicle. Tr. 159. Marie Zumpana testified at trial that she was involved in a hit and run accident with a white car with the partial license plate number FOY on Plum Street in the Pleasant Heights section of Steubenville. Tr. 237-238. She stated that the driver was a black male with light skin and had on a white T-shirt. Tr. 238. Her car was

disabled, however, the white car was still working and the driver continued on driving to Union Street. Tr. 238. Also, Kevin Bickford, a worker from Digital Dish, was working on State Street in Steubenville on July 2, 2012, and testified at trial. He indicated he heard gunshots and then saw a car traveling at a high rate of speed and crash at the bottom of the street where there is a park. Tr. 243-244. He said the car was white. Tr. 243. He then saw a man get out of the car, take off, then come back and get something, and then take off again. Tr. 244.

**{¶18}** The state's position focuses on the following facts. Johnson took the overt act to turn the car around after passing the car driven by Hampton that contained Creech, C.J. and Owens, and followed them. He used the car door as a shield, and according to the state, had to lift the semi-automatic assault rifle over the window to begin shooting. He then used the car to drive off. The state maintains that this is substantial physical connection to the vehicle.

**{¶19}** Johnson disagrees. He argues that the above facts are not enough to establish a substantial physical connection.

**{¶20}** After reviewing the *Swidas* case in its entirety, we agree with Johnson. In *Swidas*, testimony established that he was standing behind a car door when firing at the victim. *Swidas*, 2012-Ohio-4638, ¶ 4. The victim testified that Swidas was between the door and the vehicle and was using the door as a shield. *Id.* at ¶ 5. In discussing the facts the Court made the following statement:

> Our parsing of prepositions continues in determining whether Swidas had a substantial physical connection to the motor vehicle when he shot Altizer; the key to this analysis is the victim's use of the word "over." Altizer testified, "He was over the windshield of the car a little bit, pointing a gun at me, shooting." He did not testify that any part of Swidas was on the vehicle. The appellate court incorrectly stated that Swidas was "leaning on the vehicle as he discharged his weapon." The state cites nothing in the record that supports the appellate court's statement; no testimony even suggests that Swidas was on the car.

Indeed, the state does not rely on physical contact to make its case; instead, it basically argues that the vehicle was the instrumentality, the sine qua non, of the crime. That is the same reasoning that the trial court used in denying Swidas's motion to dismiss the R.C. 2941.146 specification. The state argues that the vehicle was "the starting point from which Appellant staged his attack," that it was "the origin from which Appellant retrieved his gun," that it provided "protection and concealment" for Swidas, and that it was the means by which Swidas "was able to make a rapid escape from the crime scene." All those statements are true, all supported by testimony, but none are relevant to R.C. 2941.146. The key to a violation under R.C. 2941.146 is the location of the shooter at the time of the shooting. In this case, there is no evidence suggesting that Swidas had even incidental contact with the vehicle when he fired his weapon. The "from" in this case is a spot next to the motor vehicle.

*Swidas*, 2012-Ohio-4638, ¶ 22-23.

{¶21} Here, Thorn is the only person who testified that she saw Johnson shooting. She said he got out of the car with a shotgun and was using the door as a shield. She does not state he is leaning on the car or indicate that he had any contact with the car. Thus, the facts in this case are similar to *Swidas*.

{¶22} Therefore, on the basis of *Swidas*, the conviction and sentence for the "drive-by" specification must be reversed and vacated. This assignment of error has merit.

<u>Second Assignment of Error</u>

{¶23} "The jury verdict of guilty to the offenses of attempted murder and felonious assault was against the manifest weight of the evidence."

{¶24} When reviewing a judgment under a criminal manifest weight standard of review, "[t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a

manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶25} This court's discretionary power to reverse on manifest weight grounds and grant a new trial is exercised only in the exceptional case where the evidence weighs heavily against conviction. *Thompkins* at 387. This standard is a high one because the trier of fact was in a better position to determine credibility issues, by having personally viewed the demeanor, voice inflections and gestures of the witnesses. *State v. Ali,* 154 Ohio App.3d 493, 2003–Ohio–5150, 797 N.E.2d 1019, ¶ 36 (7th Dist.); *State v. DeHass,* 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). A reviewing court therefore should not interfere with the witness credibility and factual determinations of the jury, unless the record demonstrates that a reasonable juror simply could not have found the witness to be credible. *State v. Mock,* 187 Ohio App.3d 599, 2010–Ohio–2747, 933 N.E.2d 270, ¶ 40 (7th Dist.).

{¶26} In this assignment of error, Johnson argues that his convictions for felonious assault, in violation of R.C. 2903.11(A)(2), and attempted murder, in violation of R.C. 2923.02(A) and R.C. 2903.02(A), were against the manifest weight of the evidence. R.C. 2903.11(A)(2) defines felonious assault as "no person shall knowingly * * * cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." Attempted murder is defined in R.C. 2923.02 and R.C. 2903.02(A) as no person shall purposely attempt to cause the death of another.

{¶27} It is undisputed that the shooting at the car which contained Thorn, Hampton, Creech, C.J. and Owens meets the elements of felonious assault and attempted murder. The only element contested in this case is appellant's identity as the perpetrator of the shooting. It is well settled that in order to support a conviction, the evidence must establish beyond a reasonable doubt the identity of the defendant as the person who actually committed the crime at issue. *State v. Collins,* 8th Dist. No. 98350, 2013–Ohio–488, ¶ 19, citing *State v. Lawwill,* 12th Dist. No. CA2007–01–014, 2008–Ohio–3592, ¶ 11.

**{¶28}** As aforementioned, Thorn testified that she was a passenger in a car, a Gray Camry, driven by Hampton and that while they were at Marland Market in the LaBelle section of Steubenville, Creech, C.J. and Owens asked for a ride to the Pleasant Heights section of Steubenville. Tr. 151-153. Hampton's own testimony confirmed these facts. Tr. 187-188. While en route to their destination, they crossed the Lawson Avenue Bridge and passed a white car that Thorn avowed Johnson was driving; Hampton testified that while they were passing the car, Thorn said, "There goes Smiley." Tr. 154, 190.

**{¶29}** The men in Hampton's car directed her to Orchard Street in the Pleasant Heights section of Steubenville and the women proceed to attempt to let the men out of the car. Tr. 156. As the men were getting out of the car, Thorn noticed the white car that they passed on the bridge come up behind them. Tr. 157. She testified that Smiley got out of the car, used the driver's door as a shield, and started shooting. Tr. 157. She indicated that both Owens and C.J. were able to get out of the car and run, but Creech remained in the car. Tr. 159. At trial, she identified Johnson as Smiley, the shooter/driver of the white car. Immediately upon hearing the shots, Thorn told Hampton to drive and Thorn called 911.

**{¶30}** The 911 call was played for the jury. In that call, Thorn indicated that there was a shooting and she identified the shooter as driving an older white Ford Taurus. Tr. 162. She told the 911 operator that the shooter/driver was a mixed race, light skinned male with an Afro named Smiley. Tr. 162-163.

**{¶31}** Hampton confirmed much of Thorn's testimony, such as Thorn telling her to drive once Thorn heard the shots and that Creech remained in the car but the other two were able to get out and run for cover. Tr. 192-194. However, Hampton did not see who was shooting at them and did not see the driver of the white car; she was not even sure where the shooting was coming from. Tr. 192-193. At trial, however, she testified that the person she knows as Smiley is Johnson. Tr. 196, 198.

**{¶32}** Both Thorn and Hampton viewed photographic lineups. Hampton was asked to identify the person she knows as Smiley. She quickly picked Johnson in that lineup and indicated that she was 100 percent sure that that was the person she

knows as Smiley. Tr. 196-198, 383. Thorn was asked to identify the shooter. She also quickly picked Johnson as the shooter and as the person she knows as Smiley. Tr. 170-172, 353-356. However, she stated she was only 50 percent sure that that was him when she was viewing the lineup. Tr. 171-172, 353. When asked about this, she explained that she was really nervous at the viewing and that she was a 100 percent sure, not 50 percent sure. Tr. 172. She was then asked a couple times if she was sure Johnson is the person she knows as Smiley and if he was the shooter. Tr. 172. She indicated that she was 100 percent sure it was him. Tr. 172. The videotape of the photo identification was played for the jury and the officer who conducted that lineup testified. In the video, after identifying Johnson, she asked if she had to testify and indicated that she was nervous because of the shooting. Tr. 353-354. She also indicated that his hair was different from the picture. Tr. 354. The officer testified that she had no problem in identifying the individual and that she identified Johnson in a matter of seconds. Tr. 356.

{¶33} Thorn is the only witness to identify Johnson as the shooter. As stated above, Hampton did not see who was shooting. There was one other witness to the shooting, Stephanie Luke. Luke is Owens' cousin and she lives at 1526 Orchard Street in Steubenville. Tr. 219, 221. She was outside with her great grandson when Owens and his friends arrived at her house. Tr. 219. She indicated as soon as the men got out of the car shooting started. Tr. 222. At that point, she grabbed her grandson, went into the house and called the police. Tr. 222. She testified that Owens had a gun and Creech and the "other boy" had a gun. Tr. 229. Her testimony was that all three men got out of the Camry driven by Hampton. Tr. 229.

{¶34} As can be seen, her testimony is in partial conflict with Thorn and Hampton's testimony on an inconsequential detail in this case – whether Creech remained in the Camry driven by Hampton or if he got out of the car. This could create a credibility question as to who to believe. As previously indicated, the jury is in the best position to judge credibility. It is free to believe all, part or none of a witness's testimony. *State v. Helman,* 7th Dist. No. 03CO55, 2004–Ohio–4867, ¶ 12.

{¶35} Furthermore, although Thorn's identity of Johnson at the lineup was only 50 percent certain, the jury could have believed her trial testimony that she was 100 percent certain it was him. Her identification of him along with Hampton's identification that Johnson is the person she knows as Smiley could have been enough for the jury to find that he was the perpetrator of the shooting.

{¶36} That said, that was not the only evidence that provided identification in this case. There was also circumstantial evidence of identification.

{¶37} Following the shooting, Marie Zumpana was involved in a hit and run accident with a white car with the partial license plate number FOY on Plum Street in the Pleasant Heights section of Steubenville. Tr. 237-238. She stated that the driver was a black male with light skin and had on a white T-shirt. Tr. 238. Her car was disabled, however, the white car was still working and the driver continued driving to Union Street. Tr. 238. Thorn testified that after the shooting when they came back around, they saw that the white car Johnson was driving had wrecked into another vehicle. Tr. 159.

{¶38} Kevin Bickford, a worker from Digital Dish was working on State Street in Steubenville on July 2, 2012 and he heard gunshots and then saw a car traveling at a high rate of speed and crash at the bottom of the street where there is a park. Tr. 243-244. He said the car was white. Tr. 243. He then saw a man get out of the car, take off, then come back and get something, and then take off again. Tr. 244.

{¶39} Patrolman Rob Cook testified that there was a white vehicle wrecked at the end of State Street. Tr. 251. In the weeds behind a house in that area he found an AK-47 assault rifle, specifically a Norinco 7.62 caliber semiautomatic rifle. Tr. 260. It was loaded with live 7.62 rounds and one live round in the chamber. Tr. 255. Edward Lulla from the Ohio Bureau of Criminal Identification and Investigation (BCI) testified that he searched the white vehicle with license plate number FOY 8818. Tr. 268. In the trunk, he found a 7.62 by 39 live cartridge. Tr. 270. Sergeant Robert Gotschall, who was the first officer to arrive at the scene of the shooting at Orchard Street, found shell casings in the alley that were collected as evidence. Tr. 140-146. There were 17 casings found. Tr. 146. Andrew Chappell, a forensic scientist

assigned to the firearms section of BCI, tested the casings, cartridges and the Norinco rifle. Tr. 452-452, 454. He stated that the Norinco rifle was operable and the 17 casings found at the scene of the shooting were fired from the Norinco rifle. Tr. 459-460. Although the gun, casings and cartridges were swabbed for DNA, it could not be determined whose DNA was found on it because there was not enough DNA found. Tr. 467, 506.

{¶40} Lulla, also in searching the car, found a white shirt, a Dairymen's brand lemonade drink, a water bottle, and a .40 caliber Taurus Millennium, Model PT 140 Pro. Tr. 273. The gun was loaded and had a live cartridge in the chamber. Tr. 273, 278-279. There was also a bullet hole in the windshield of the car and a bullet was removed from the back seat of the car. Tr. 270.

{¶41} Starting with the Millennium gun, it was determined to be operable and it was swabbed for DNA. Tr. 465, 504. There was a DNA type or profile generated from this sample, however, there was a mixture of DNA that was not suitable for comparison. Tr. 505-506. This means there was five, six or more contributors to the DNA mixture that was found on this gun. Tr. 505.

{¶42} The bullet that was found in the back seat of the car was examined. It was not fired from the Norinco rifle. Tr. 463. It was determined to be a .38 caliber class bullet that would include calibers like .9 millimeter Luger, .38 Special, .357 Magnum and .357 Sig. Tr. 462-463.

{¶43} Out of the remaining evidence, two fingerprints found on the lemonade drink were identified as coming from Johnson. Tr. 492. Furthermore, his DNA was also found on that drink bottle; the expected frequency of the DNA profile on this bottle is 1 in 9,533,000,000,000,000,000 unrelated individuals. Tr. 503, 510. His DNA and the DNA of two other individuals was found on the white T-shirt; the frequency for this DNA profile is 1 in 1,060,000 unrelated individuals. Tr. 505, 510.

{¶44} Upon his arrest, cellular telephones were seized from the house where he was found. Tr. 516. A picture sent to one of the phones showed a bracelet that said "I ♥ Smiley." Tr. 533; State's Exhibit 57. There were also messages sent to one of the phones about "swat" being in town. Tr. 536-537; State's Exhibit 59.

**{¶45}** All of the above testimony provides circumstantial evidence that Johnson was the shooter. His DNA and fingerprints are found on a lemonade bottle in the white Taurus with license plate FOY 8818 that had come to a stop at the end of State Street in Steubenville. Shortly after the shooting, a white car with partial plate FOY with a light skinned black male in it was involved in a hit and run. Shortly after hearing shots, one witness saw this car wreck at the end of State Street and a male exit the car and run off. Near the resting spot of the white car, a Norinco rifle was found. Testing on that rifle confirmed that the bullets found at the scene of shooting were from that rifle. The phone also found at the residence where Johnson was apprehended had the picture of the bracelet that said I love Smiley. Hampton's identification indicated that Johnson is the person she knows as Smiley. All of this evidence taken together, if believed, indicates that Johnson is the shooter. Circumstantial evidence has the same probative weight as direct evidence. *State v. Nicely*, 39 Ohio St.3d 147, 151, 529 N.E.2d 1236 (1988); *State v. Terlesky*, 7th Dist. No. 05MA237, 2007-Ohio-3402, ¶ 90.

**{¶46}** As previously stated, the jury was in the best position to determine credibility and determine which evidence to believe. Considering the evidence, we hold that the determination that Johnson was the shooter is supported by competent, credible evidence. Therefore, the jury did not clearly lose its way and, as such, a manifest miscarriage of justice was not created by the jury's verdict. This assignment of error is deemed meritless.

Third Assignment of Error

**{¶47}** "The trial court abuses [sic] it's [sic] discretion qualifying Detective John Lelless as an expert."

**{¶48}** The admission or exclusion of evidence lies in the trial court's sound discretion. *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987). In order to find an abuse of that discretion, we must determine that the trial court's decision was unreasonable, arbitrary, or unconscionable; and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

**{¶49}** A large portion of Detective John Lelless' testimony was discussing Johnson's tattoos and using that evidence as a basis for showing that Johnson is part of the Blue Devil gang. This was the only testimony showing evidence that Johnson is in a gang. Thus, if this testimony was not proper, the gang specification would be based on insufficient evidence, i.e. the state would not have met its burden of production. Johnson objected to Detective Lelless' testimony about tattoos and the fact that they showed Johnson was a member of a gang. Tr. 388-396.

**{¶50}** This assignment of error appears to be based on a false premise that Detective Lelless was found to be an expert. The record is devoid of any request by the state asking for him to be determined to be an expert. Furthermore, there is no clear statement from the court finding him to be an expert. With all the BCI witnesses, the prosecutor asked for them to be determined to be experts and the court found that they were. Tr. 464, 468, 482, 496, 518. That was not done with Detective Lelless.

**{¶51}** The state asserts that Detective Lelless' testimony was proper under Evid.R. 701, Opinion testimony by lay witnesses.

**{¶52}** Given the state's position, our starting point for this assignment of error is determining whether Detective Lelless' testimony is opinion testimony by a lay witness or if it is so specialized that it could only be given by an expert. As stated above, Detective Lelless' testimony concerns the tattoos on Johnson's chest and arms and how those tattoos identify Johnson as a member of the Blue Devil gang, which is a subset of the Crips. He testified that a major way to identify members of the Blue Devil gang is by body art/tattoos. Tr. 394. State's Exhibit 36 contains multiple pictures of Johnson's tattoos. He has the word "Blue" across his right shoulder and the word "Devil" across his left shoulder. Detective Lelless explained how these tattoos identify him as a Blue Devil gang member:

> A. * * * At the bottom of the "Blue" or the "B" in "Blue," they don't always like to use the letter "B" because it represents a rival gang called the Bloods. So, they'll normally put a "K." To the bottom there, you can

barely distinguish it, it has a "K." And to the Crips, that means "Blood Killer."

In the "D," and some of the other pictures will clearly depict that, there's an "X." What's common within the Crip alphabet, they will place an "X" in various letters within their alphabet, D's, I's, and various letters like that.

What's depicted is a prayer in the breast area on the right side of Mr. Johnson should he die, he prays that the Lord takes him. And conveniently to the left are the Gates of Hell.

These little handles are shaped in the letter C with a gangster on his or her knees praying that he doesn't enter the Gates of Hell, that he would go to heaven, be with whatever God Mr. Johnson or fellow gang members pray to.

Tr. 401-402.

**{¶53}** This is just a portion of his testimony that shows the knowledge that Detective Johnson has in identifying tattoos that indicate gang affiliation and to what gang that person might belong.

**{¶54}** Lay witness testimony is defined in Evid.R. 701 as:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Evid.R. 701.

**{¶55}** Under Evid.R. 702 a witness may testify as an expert if all of the following applies:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *

Evid.R. 702(A)-(C).

{¶56} The Fifth and Twelfth Appellate Districts have explained the distinction between lay person opinion testimony and expert opinion testimony. *State v. Russell*, 12th Dist. No. CA2012-08-156, 2013-Ohio-3079, ¶ 36; *State v. Lewis,* 192 Ohio App.3d 153, 2011-Ohio-187, ¶ 23 (5th Dist.). Lay person opinion testimony "results from a process of reasoning familiar in everyday life, while expert opinion testimony results from a process of reasoning that only specialists in the field can master." *Russell*, quoting *Lewis*.

{¶57} Appellate courts have determined that some testimony offered by officers/detectives is lay person witness testimony even though it is based on the officer/detective's specialized knowledge. *State v. McClain*, 6th Dist. No. L-10-1088, 2012-Ohio-5264, ¶ 13 (Detective's testimony that quantities of narcotics recovered during the execution of the search warrant suggested that they were for sale as opposed to personal use was admissible under Evid.R. 701 as lay person opinion testimony. Detective's testimony was based on fact that 16 year veteran officer who has been assigned to narcotics and vice unit for 12 years; testimony was based on his perception and experience as a police officer.); *State v. Primeau*, 8th Dist. No. 97901, 2012-Ohio-5172, ¶ 71-75 (Officer, without medical expertise, was permitted to testify about his observation of the lacerations on appellant's hand. The court stated that description was based on his previous investigations of assaults and his perception of appellant's lacerations at that time. Thus, the testimony was proper under Evid.R. 701.); *State v. Williams*, 9th Dist. No. 25716, 2011-Ohio-6604, ¶ 11 (Officer's testimony that place definitely was a methamphetamine lab was based on personal observation from items taken from garbage and found in the house. It was proper testimony under Evid.R. 701.); *State v. Cooper*, 8th Dist. No. 86437, 2006-

Ohio-817, ¶ 18 (In forgery case, detective permitted under Evid.R. 701 to testify based on his experience as a police officer, his pervious investigations of forgeries and his perception of the handwriting samples at issue.).

**{¶58}** The Ohio Supreme Court has even observed that courts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702 and that such permission was not necessarily incorrect. *State v. McKee*, 91 Ohio St.3d 292, 2001-Ohio-41, 744 N.E.2d 737. The Court also confirmed that a drug user is permitted to testify about the identity of drugs if the proper foundation is first laid. *Id.* It explained:

> Although these cases are of a technical nature in that they allow lay opinion testimony on a subject outside the realm of common knowledge, they still fall within the ambit of the rule's requirement that a lay witness's opinion be rationally based on firsthand observations and helpful in determining a fact in issue. These cases are not based on specialized knowledge within the scope of Evid.R. 702, but rather are based upon a layperson's personal knowledge and experience.

*Id.*

**{¶59}** That said, the Sixth Appellate District has stated that an officer's testimony that it is common for victims of sexual assault to delay reporting the incident to authorities is not knowledge that the average juror has and, as such, is properly categorized as expert testimony under Evid.R. 702. *State v. Solether*, 6th Dist. No. WD-07-053, 2008-Ohio-4738, ¶ 65 (Officer was permitted to testify under Evid.R. 702).

**{¶60}** The above is illustrative as to what type of testimony can be lay witness testimony and what has to be expert witness testimony. When the topic is narrowed to gang activity, the case law is sparse. The cases do not discuss both Evid.R. 701 and Evid.R. 702 and indicate what type of gang testimony falls under Evid.R. 701 versus Evid.R. 702. Rather, the cases focus on one of the rules and discuss whether the officer's testimony qualifies under that rule.

{¶61} For example, the Ohio Supreme Court has concluded that an officer was qualified as an expert to testify to gang related activity; testimony showed that the officer possessed specialized knowledge about gang symbols, cultures, and traditions beyond that of the trier of fact. *State v. Drummond*, 111 Ohio St. 3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 116. The Ninth Appellate District has stated that an officer's testimony about gang activities qualified as expert testimony and was admissible under Evid.R. 702. *State v. Jefferson*, 9th Dist. No. 20156, 2001 WL 276343 (Mar. 21, 2001). The officer's knowledge was not possessed by the average trier of fact because it included the significance of gang graffiti and seemingly meaningless phrases, the typical structure of a gang, and alliances among gangs. *Id.* The Second Appellate District stated that the officer would qualify as an expert because his testimony demonstrated that he possessed specialized knowledge beyond that of lay persons on that topic. *State v. Lewis*, 2d Dist. No. 96 CA 12, 1997 WL 156596 (Apr. 4, 1997). The Tenth Appellate District has found that an officer and eye witnesses could testify about gang activity under Evid.R. 701 as a lay witness. *In the Matter of Jones*, 10th Dist. No. 98AP-152, 1998 WL 680979 (Sept. 30, 1998). These witnesses personally observed gang behavior in general and appellant's gang involvement.

{¶62} Here, although Detective Lelless did not testify that he personally observed Johnson's gang activity, his testimony could be proper lay witness opinion testimony under Evid.R. 701, if the proper foundation was laid. The Ohio Supreme Court's decision in *McKee* supports this conclusion because although his knowledge is specialized as to body art and tattoos that identify an individual as a member of the Blue Devil gang, that is based on his personal knowledge and experience in the field.

{¶63} The foundation for his testimony establishes his personal knowledge and experience in the field. Detective Lelless testified that he has been a police officer for 23 years and for the past 18 years he has been a detective. Tr. 378. He explained that for the past 20 years he has taught at Eastern Gateway Community College in the police academy. Tr. 386. He indicated that one of courses he has taught is gang identification and investigation. Tr. 386. He stated that everyday he is

learning about gang identification, tattoos, and markings and he has testified in numerous cases on the issue of gang activity and whether the offender/victim is a gang member. Tr. 386-387. He indicated that he has done research in the area of gang activity and is in the field gathering intelligence on gang activity in the local area almost daily; he talks to informants, gang members that have been arrested and uses the internet, FaceBook and Twitter. Tr. 392-393. He indicated that in the Steubenville Police Department, he has been involved in gang intelligence since 1992. Tr. 393. He also indicated that there are some specific types of tattoos that members of the Blue Devil gang have and that he recognizes them when he sees them. Tr. 394. He testified that the Blue Devil gang has been in existence in Steubenville since late 1999, early 2000 and that while he could not identify who was the founding member of the gang he could narrow it to the main individuals, who go by the last names of "Wise, Wook and Michael Taylor." Tr. 395. However, he could not state how many members of the Blue Devil gang he has arrested, prosecuted or testified against as to their involvement in gang activity and/or about their body art. Tr. 395-396. He would not even give an estimate. Tr. 396.

**{¶64}** Consequently, given the above the proper foundation was laid and this foundation established that he could testify as a lay witness.

**{¶65}** That said, the above foundation also establishes that he is an expert. His testimony relates to matters beyond the knowledge or experience possessed by lay persons; he is qualified by his specialized skill, knowledge and experience, and his testimony is based on specialized information. Evid.R. 702(A)-(C). The Ohio Supreme Court has explained:

> Evid.R. 702(B) provides that a witness may qualify as an expert by reason of his or her specialized knowledge, skill, experience, training, or education. Neither special education nor certification is necessary to confer expert status on a witness. The witness offered as an expert need not have a complete knowledge of the field in question, as long as the knowledge he or she has will aid the trier of fact. *State v. Baston* (1999), 85 Ohio St.3d 418, 423, 709 N.E.2d 128.

*State v. Hale,* 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 54. *See also Drummond,* 2006-Ohio-5084 at ¶ 116 ("Neither special education nor certification is necessary to confer expert status upon a witness. The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function.").

**{¶66}** Therefore, had the state asked, the trial court could have found Detective Lelless to be an expert; that decision would not have amounted to an abuse of discretion. *Dunn v. Ransom,* 4th Dist. No. 10CA806, 2011-Ohio-4253, ¶ 40 (Trial court have properly qualified witness as expert under Evid.R. 702.); *State v. McGlown,* 6th Dist. No. L-07-1163, 2009-Ohio-2160, ¶ 43 (Although trial court did not expressly determine the detective to be an expert, the trial court did not abuse its discretion in allowing him to testify as an expert witness.); *State v. Lewis,* 2d Dist. No. 96 CA 12, 1997 WL 156596 (Apr. 4, 1997) (Officer could have properly qualified as expert and trial court would not have excluded the officer's testimony.)

**{¶67}** In short, the trial court did not abuse its discretion in allowing Detective Lelless to testify about body art and tattoos that potentially identified Johnson as a Blue Devil gang member. Detective Lelless' testimony qualified either under Evid.R. 701 or under Evid.R. 702. This assignment of error is meritless.

Conclusion

**{¶68}** For the foregoing reasons, the first assignment of error has merit. The second and third assignments of error are meritless. The conviction and sentence for the R.C. 2941.146 "drive-by" specification is reversed and vacated. All other convictions and sentences are affirmed.

Donofrio, J., concurs.
DeGenaro, P.J., concurs.