[Cite as *State v. Clark*, 2017-Ohio-7633.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27365 |
| | : | |
| v. | : | Trial Court Case No. 16-CR-1817 |
| | : | |
| ANTHONY CLARK | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 15th day of September, 2017.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. JANS, Atty. Reg. No. 0084470, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45402
  Attorney for Plaintiff-Appellee

TRAVIS KANE, Atty. Reg. No. 0088191, 1015 East Centerville-Station Road, Centerville, Ohio 45459
  Attorney for Defendant-Appellant

. . . . . . . . . . . .

HALL, P.J.

{¶ 1} Anthony Clark appeals from his convictions for felonious assault, discharge of a firearm on or near prohibited premises, and having weapons under disability. Finding no error, we affirm.

### I. Background

{¶ 2} Kimber Baker was friends with Beth Ann Adams and knew Adams's boyfriend, Clark. According to Baker, in April or May 2016, she learned that Adams and Clark were having relationship problems. It seems that Adams had met Baker's step-brother and that the two of them now had some sort of a relationship. One day, near the end of May, Clark came to Baker's house, put a gun through the mail slot and started asking her where Beth was. Baker begged him to leave, and eventually he did. Afterwards, Adams stopped being friendly with Baker and became angry.

{¶ 3} On May 30, about a week after the gun-through-the-mail-slot incident, Baker left her house to pick up her sister-in-law. Baker had her three-year-old nephew and her one-year-old son with her. According to Baker, while she was stopped at a red light, Adams pulled up next to her and started yelling and swearing at her. Adams then jumped out of her car and came towards Baker's truck. Baker took off, running a red light to get away. She turned around and went back home. She parked in front of her house and was getting the children out when Baker saw Adams coming up the street behind her. Baker quickly shepherded the children into the front seat and drove away.

{¶ 4} She turned into an alley to cut across to another street. But just as Baker reached the end of the alley, Clark suddenly pulled up from the right and stopped in front of her at an angle, almost nose-to-nose with her truck, facing the truck's passenger side.

Baker watched as he pointed a handgun and fired three times—first at the truck's tires and then twice more, with the last shot aimed right at Baker. Adams then pulled into the alley behind Baker. Clark and Adams were out of their cars when Baker hit the gas, driving over the left curb to get around Clark's car. She drove straight to her father's house where she called the police.

{¶ 5} Dayton police officers Mitchell Olmstead and Christopher Fogle responded. When the officers met with Baker, she appeared very upset and scared. Baker told them what had happened and identified Clark as the shooter. While Olmstead spoke with Baker, Fogle looked over Baker's truck. He saw a bullet hole in the passenger-side fender behind the tire and glancing strikes on the hood and windshield. Later, Dayton police homicide detective Nathan Via examined the truck and also saw the bullet hole and the two glancing strikes. He interviewed Clark, and Clark denied any involvement in the incident.

{¶ 6} In July 2016, Clark was indicted on three counts of second-degree felonious assault (deadly weapon), under R.C. 2903.11(A)(2), each of which included a three-year and five-year firearm specification and a repeat-violent-offender specification; one count of third-degree discharge of a firearm on or near prohibited premises, over a public road or highway when there is a substantial risk of physical harm to any person or serious physical harm to property, under R.C. 2923.162(A)(3) and (C)(2), along with a three-year firearm specification; one count of third-degree having weapons under disability (prior drug conviction), under R.C. 2923.13(A)(3); and another count of third-degree having weapons under disability (prior offense of violence), under R.C. 2923.13(A)(2).

{¶ 7} A jury trial was held on the felonious-assault and discharge-of-a-firearm

offenses, and the two having-weapons-under-disability offenses were tried to the court. Clark was found guilty on all counts and specifications. At sentencing, when all was said and done as to merger and consecutive service, Clark's total prison sentence is 23 years.

{¶ 8} Clark appealed.

## II. Analysis

{¶ 9} Clark presents six assignments of error challenging the weight of the evidence, the effectiveness of trial counsel, the failure to merge certain offenses for sentencing purposes, the imposition of consecutive sentences, his ability to impeach Baker, and the denial of a continuance.

### A. *The manifest weight of the evidence*

{¶ 10} The first assignment of error alleges that Clark's convictions are against the manifest weight of the evidence.

{¶ 11} Manifest weight "concerns 'the inclination of the *greater amount of credible evidence * * ** to support one side of the issue rather than the other.' " (Emphasis sic.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). "A manifest-weight challenge requires us to consider the entire record, including the credibility of the witnesses, the weight of the evidence, and any reasonable inferences and determine whether ' "the [panel] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." ' " *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶ 75, quoting *id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 12} Clark was convicted of three counts of felonious assault under R.C.

2903.11(A)(2), which pertinently prohibits a person from attempting to harm another "by means of a deadly weapon." He was also convicted of discharge of a firearm on or near prohibited premises under R.C. 2923.162(A)(3) and (C)(2). And Clark was convicted of two counts of having weapons under disability under R.C. 2923.13(A)(2), which pertinently prohibited him from "acquir[ing], hav[ing], carry[ing], or us[ing] any firearm." Clark argues that Baker's testimony that he fired a gun at her is not clear or consistent and is contradicted by the testimony of other witnesses.

{¶ 13} Baker testified that just as she reached the end of the alley that she had driven down, Clark pulled up in his car from the right and stopped at an angle in front of Baker's truck, facing the truck's passenger side. Baker said that, while still in his car, Clark pointed a handgun and fired three times—first at her truck's tires and then, moving upwards from left to right, twice more, with the last shot aimed at her. Adams then pulled in behind her truck, said Baker, and Clark and Adams both got out of their cars and walked toward her truck. Officer Olmsted testified that when he met with Baker at her father's house she appeared very upset and scared. He also said that she identified Clark as the shooter.

{¶ 14} The two police officers who examined Baker's truck, Officer Fogle and Detective Via, found evidence of three recent bullet strikes. They found a penetrating strike, just behind the front wheel well; a glancing strike on the hood; and a glancing strike on the windshield. This testimony is consistent with Baker's claim that Clark fired three times, first at the truck's tires and then, moving upwards from left to right, two more times with the last shot aimed at her. Both officers also testified that the bullet strikes were fresh. Officer Fogle testified that the bullet hole was "fairly recent," as there was no rust forming

around the area where the paint was missing from the metal. Similarly, Detective Via testified that the damage to the truck was consistent with fresh, new damage, because there was no rust or flaking paint in or around the edges of the bullet hole that would indicate age. The police officers' testimony as to the angles at which the bullets struck the truck also corroborate Baker's testimony that when Clark fired the gun, he was to the right of the truck, on the passenger side. Detective Via said that the angles suggest that the gun was fired on the passenger side. He said that the penetrating strike entered at "a slight angle, fired from, more over to the left." (Tr. 139). Officer Fogle testified that the hood strike "would have been traveling from the front passenger side, or front right side of the vehicle, towards the driver's side." (*Id.* at 132). The penetrating strike, said Fogle, "came from generally the same trajectory as the one on the hood." (*Id.* at 134). No bullet casings were found at the scene. But Detective Via testified that if the gun was a revolver, no casings would have been ejected. And if the gun was semiautomatic, he said, given Baker's testimony about the angle that Clark fired the gun and that he fired the gun from inside his car, the casings could have been ejected into the car. We note too that Detective Via testified that he had approximately 20 years of police experience and had investigated over 10,000 individual cases, well over 100 of which involved an individual being fatally shot inside an automobile.

{¶ 15} Adams testified at trial, and her testimony contradicts Baker's in many respects. Adams testified that on the day of the incident she and Clark had returned home from a camping trip. She said that it was Baker who pulled up alongside her at an intersection and began screaming and swearing. Adams said that Baker got out of her truck, walked over to her car, and reached in and grabbed her purse. She was following

Baker, said Adams, because she wanted her purse back. When she pulled into the alley after Baker, Adams said, she saw Baker's truck stopped at the end. She also saw Clark's car, though she did not see Clark at first. Adams testified that she heard no gunshots, that the shooting did not occur, and that Clark did not have a gun.

{¶ 16} There are at least two plausible explanations for Adams's claims. One, based on the sequence of events in Baker's testimony, it is possible that Clark had already fired the shots before Adams arrived and that she simply did not see the gun. Or two, Adams lied. Both women testified that there was bad blood between them. (The reason why is unclear.) Also, Adams's testimony shows that she had a strong connection with Clark. She had just returned from a camping trip with him. He was the father of her son and her friend and "only family," (Tr. 181). Also, the house in which Adams and her son lived belonged to Clark's brother. She admitted that she lived in the house only because of her connection with Clark.

{¶ 17} Elaine Huddleston also testified at trial for the defense. She testified that on May 12, a couple of weeks before the shooting, a woman in a blue truck that Huddleston had never met before stopped to help her start her vehicle. The woman introduced herself as "Kimber, or Kimbra." (*Id.* at 191). Huddleston testified that while the woman was working on the vehicle, Huddleston noticed a bullet hole in the woman's truck in roughly the same location as the hole that police found in Baker's truck after her encounter with Clark. Baker had expressly testified that that the bullet hole was not there before her encounter with Clark.

{¶ 18} We note that Huddleston's testimony does not definitively identify the truck she saw as the truck that Baker was driving during her encounter with Clark. When shown

a picture of the bullet hole in Baker's truck, all that Huddleston could say was that "it very well could have been this vehicle." (*Id.* at 194). She could not identify the make or model. The most that Huddleston could say about the truck was that it was blue. The testimony also revealed that Huddleston is Clark's aunt. And Huddleston testified that she had a close relationship with Clark, Adams, and their son, who she frequently watched. We note too that Huddleston admitted that after the first day of trial, when Baker testified, she spoke to Clark on the phone and that he "mentioned one thing" about Baker's testimony and told her to tell Adams, which Huddleston did. (*Id.* at 196).

{¶ 19} Ultimately, it was entirely within the province of the jury to believe Baker over Adams and Huddleston. *See State v. White,* 2d Dist. Montgomery No. 20324, 2005-Ohio-212, ¶ 69. "The jury is the sole judge of the weight of the evidence and the credibility of witnesses. It may believe or disbelieve any witness or accept part of what a witness says and reject the rest. In reaching its verdict, the jury should consider the demeanor of the witness and the manner in which he testifies, his connection or relationship with the prosecution or the defendant, and his interest, if any, in the outcome." *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964). Accordingly, the jurors were in the best position to judge Baker's, Huddleston's, and Adams's credibility and determine what testimony should be given the most weight.

{¶ 20} Clark challenges Baker's credibility based on her inability to identify which hand Clark used to fire the gun. At trial, Baker testified she was "not sure" which hand Clark used. (Tr. 97). She explained that she "didn't pay no (sic) attention to what hand * * * the gun was in," "I just know that he shot the gun." (*Id.* at 109-110). On cross-examination, defense counsel tried to get Baker to say that at the preliminary hearing she

had testified that Clark used his left hand. On re-direct, the State had Baker read from the transcript of that hearing:

Question: " 'Which hand did he use to shoot with you at—or at you?' " (*Id.* at 113).

Answer: " 'It looked like his left arm. I don't know. I'm not sure. I didn't honestly—I don't know.' " (*Id.*)

It appears that Baker simply did not remember in which hand Clark was holding the gun. Given that a man was blocking her way and pointing and firing a gun at her and her children, we believe evaluation of Baker's testimony was for the jury to determine.

**{¶ 21}** Clark also challenges Baker's credibility using Officer Olmsted's testimony. Olmsted testified that he understood that when Baker saw Clark with the handgun, Clark was outside of his car. But Olmsted also said that he was "not real sure about the—the order. If [Clark] was in the car or out of the car when he fired the gun." (*Id.* at 121). After reviewing his report, Olmstead said that the way he worded the event in his report is that Clark exited his vehicle and then Baker saw the gun in his hand. But Olmstead testified that he did not go to the scene with Baker and review the sequence of events step-by-step. Nor did Baker ever review the report for accuracy. "As the finder of fact, the jury was entitled to reconcile any differences and inconsistencies in the testimony and determine that the manifest weight of the evidence supported a finding of guilt." *State v. Tyra,* 2d Dist. Montgomery No. 27040, 2017-Ohio-313, ¶ 21, citing *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Upon review of this possible inconsistency in light of the entire record we cannot say that the jury lost its way and created a manifest miscarriage of justice.

{¶ 22} The first assignment of error is overruled.

B. *Ineffective assistance of counsel*

{¶ 23} The second assignment of error alleges that Clark received ineffective assistance of counsel.

{¶ 24} "To obtain relief on the basis of ineffective assistance of counsel, the defendant as a general rule bears the burden to meet two standards. First, the defendant must show deficient performance—that the attorney's error was 'so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' Second, the defendant must show that the attorney's error 'prejudiced the defense.' " *Weaver v. Massachusetts*, __ U.S. __, 137 S.Ct. 1899, 1910, 198 L.Ed.2d 420 (2017), quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To show deficient performance, "a defendant must show that counsel's representation 'fell below an objective standard of reasonableness.' " *Lee v. United States*, __ U.S. __, 137 S.Ct. 1958, 1964, 198 L.Ed.2d 476 (2017), quoting *Strickland* at 692.

{¶ 25} Clark first argues that trial counsel acted unreasonably by not objecting when Baker testified that Clark placed a gun through her mail slot. He says that Baker's testimony is speculative because she had no personal knowledge that it was Clark who did it. By rule, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Evid.R. 602. Baker had testified that she knew Clark and was familiar with him before the incident. She had said that there was conflict between her and Clark as a result of Adams's relationship with her step-brother. And Baker said that she heard Clark asking,

" 'where's Beth, where's Beth' " and that she "begged him to leave." (Tr. 82). This evidence is sufficient to establish a foundation of personal knowledge of this matter.

{¶ 26} Clark also argues that counsel acted unreasonably by not objecting to Detective Via's lay testimony about the bullet strikes on Baker's truck. Clark contends that this testimony should not have been allowed without Via being admitted as an expert witness. But Evid.R. 701 states that "[i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." "Under Evid.R. 701, courts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702." *State v. Primeau,* 8th Dist. Cuyahoga No. 97901, 2012-Ohio-5172, ¶ 74, citing *State v. McKee,* 91 Ohio St.3d 292, 744 N.E.2d 737 (2001). "Appellate courts have * * * determined that 'some testimony offered by officers/detectives is lay person witness testimony even though it is based on the officer/detective's specialized knowledge.' " *State v. Maust*, 8th Dist. Cuyahoga No. 103182, 2016-Ohio-3171, ¶ 19, quoting *State v. Johnson,* 7th Dist. Jefferson No. 13JE5, 2014-Ohio-1226, ¶ 57. Indeed, we have found no error in admitting such testimony where an officer was testifying as to the investigation and the officer's observations and experience. *See State v. Ashe*, 2d Dist. Montgomery No. 26528, 2016-Ohio-136, ¶ 28. In sum, if testimony is based on an officer's training and experience, related to the officer's personal observations during an investigation, and helpful to determine facts in issue, the testimony may properly be admitted as lay testimony under Evid.R. 701. *See Maust* at ¶ 18; *State v. Meddock*, 2017-

Ohio-4414, __ N.E.3d __, ¶ 21 (4th Dist.).

**{¶ 27}** Here, Detective Via's testimony was based on his own observations of Baker's truck and his training and experience as a detective. He testified that he had been a police officer for approximately 20 years and a detective since 2002. As a detective, Via said, he had investigated over 10,000 cases and had investigated well over 100 cases in which an individual was fatally shot inside an automobile. He also said that he had seen bullet strikes on other vehicles like those on Baker's truck. Detective Via's testimony satisfies Evid.R. 701 and was admissible. So it was reasonable for defense counsel not to object.

**{¶ 28}** The second assignment of error is overruled.

### C. *Merger*

**{¶ 29}** The third assignment of error alleges that the trial court erred by not merging the offenses of having weapons under disability with the offenses of felonious assault under R.C. 2941.25.

**{¶ 30}** Under R.C. 2941.25, "an accused may be convicted and sentenced for multiple offenses when '(1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation.' " *State v. Williams*, 148 Ohio St.3d 403, 2016-Ohio-7658, 71 N.E.3d 234, ¶ 18, quoting *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 25. The defendant must prove entitlement to merger. *State v. Grissom*, 2d Dist. Montgomery No. 25750, 2014-Ohio-857, ¶ 44.

**{¶ 31}** We have said that to prove that the offenses of felonious assault and having

weapons under disability merge, the defendant must show that he acquired the weapon with an immediate, virtually simultaneous intent to fire it at the victim and had no other reason for possessing the weapon. *Id.* Here, the evidence shows only that Clark acquired the gun some time before shooting it at Baker. There is no evidence that Clark acquired the gun with an immediate intent to shoot it at Baker and that he had no other reason for acquiring it. So it can only be concluded that Clark's choice to possess the handgun while under disability was separate and distinct from his choice to fire it at Baker and the children, and therefore the offenses do not merge.

{¶ 32} The third assignment of error is overruled.

### D. *Consecutive-sentence factors*

{¶ 33} The fourth assignment of error alleges that the trial court erred by failing to consider the statutory consecutive-sentence factors. Clark argues that the trial court has not shown that it considered the factors in R.C. 2929.14, because the court does not state in the termination entry that it considered the statute.

{¶ 34} R.C. 2929.14 states that the court may require an offender to serve consecutive sentences "if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public," R.C. 2929.14(C)(4), and the court finds that "[a]t least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's

conduct," R.C. 2929.14(C)(4)(b).

{¶ 35} The termination entry here contains this paragraph stating the trial court's findings with respect to consecutive sentences:

> Consecutive sentence finding: consecutive sentences are necessary to punish the defendant. Consecutive sentences are not disproportionate to the seriousness of defendant's conduct and to the danger defendant poses to the public. Consecutive sentences are necessary as the harm the defendant's conduct caused is so great a single sentence will not represent the seriousness of defendant's conduct.

As for what happened at the sentencing hearing, we don't know, because no transcript of the hearing was submitted for the record. (The praecipe for transcript requests a transcript of only the "[j]ury trial.") In the absence of a sentencing-hearing transcript, we must presume the regularity of that proceeding. *See State v. Rice*, 2d Dist. Montgomery No. 27045, 2017-Ohio-122, ¶ 16 ("In the absence of a plea hearing transcript, we must presume the regularity of the proceedings below.").

{¶ 36} "[A] word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 29. Given the presumption that all was well at the sentencing hearing and the statements in the termination entry, we conclude that the trial court properly considered the consecutive-sentence factors. The evidence in the record supports the trial court's consecutive-sentence findings.

{¶ 37} The fourth assignment of error is overruled.

E. *Witness impeachment*

{¶ 38} The fifth assignment of error alleges that the trial court erred by not permitting defense counsel to impeach Baker with testimony from Officer Olmsted about a statement that she made to him that is inconsistent with her trial testimony.

{¶ 39} Evid.R. 613(B) governs the admission of extrinsic evidence of the prior inconsistent statement of a witness. The rule states that a foundation must first be established by (1) presenting the witness with the prior statement; (2) asking the witness whether she made the statement; (3) giving the witness an opportunity to admit, deny, or explain the statement; and (4) giving the opposing party an opportunity to question the witness on the inconsistent statement. *State v. Richardson*, 2d Dist. Montgomery No. 26649, 2016-Ohio-8081, ¶ 51. This foundation may be established through direct or cross-examination. *Id.*

{¶ 40} After Baker had testified, Officer Olmsted took the stand. During cross-examination, defense counsel asked him about statements that Baker had made to him as to Clark's location when he fired the gun. Olmsted testified that, according to his report, Baker had told him that Clark had gotten out of his car before firing. This contradicts Baker's trial testimony that Clark had fired the gun from inside his car. Before defense counsel got any further, the State objected to the attempt to impeach Baker, and the trial court sustained the objection.

{¶ 41} There can be no dispute here that a proper impeachment foundation was not established. Baker was never given an opportunity to admit, deny, or explain her prior statement to Officer Olmsted, because neither the State nor defense counsel specifically

asked Baker about what she had told Olmsted on this matter. What Clark argues, though, is that the State waived the right to assert that Baker was never given the opportunity to explain her statement. Clark says that the State knew that Officer Olmsted's police report contained Baker's inconsistent statement, so on direct examination the State could have given her the opportunity to explain. The State, says Clark, simply chose not to ask.

{¶ 42} Clark cites no legal authority for his waiver proposition, and we are not inclined to endorse it. Clark seems to ignore that he too knew about the inconsistent statement in Olmsted's report and that he could have asked Baker about it during cross-examination. "Absent an error of law, the admission or exclusion of evidence is a matter committed to the discretion of the trial court, and its decision regarding the admission and exclusion of evidence will not be reversed absent a demonstration of an abuse of that discretion." (Citation omitted.) *State v. Ashe*, 2d Dist. Montgomery No. 26528, 2016-Ohio-136, ¶ 24. The trial court here did not abuse its discretion.

{¶ 43} The fifth assignment of error is overruled.

### F. *Continuance*

{¶ 44} The sixth assignment of error alleges that the trial court erred by not granting Clark a continuance for his attorney to review the entirety of four hours of recordings of Clark's telephone conversations that he had while he was in jail that the State provided to the defense after the State had rested its case-in-chief. The record reflects that the State had played for defense counsel the portions of the recordings they might use for purposes of impeachment. Appellate counsel argues that the other portions of the recordings could contain "possible exculpatory evidence." Brief of Appellant at 14.

{¶ 45} A determination of whether to grant or to deny a continuance is a matter left

to the sound discretion of the trial court, and an appellate court may not disturb the trial court's ruling absent an abuse of discretion. *State v. Unger*, 67 Ohio St.2d 65, 67, 423 N.E.2d 1078 (1981). In exercising its discretion, the court should consider "the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which g[a]ve rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case." (Citation omitted.) *State v. Bocock*, 2d Dist. Montgomery No. 22481, 2008-Ohio-5641, ¶ 23.

**{¶ 46}** Clark argues that defense counsel had not been provided a recording of these jail calls before the trial and never had the opportunity to listen to them. Consequently Clark says that counsel never had the chance to listen to the other parts to see if they contained anything potentially exculpatory. When the motion was made, the State had rested its case and the defense had yet to begin, and granting a short delay to allow defense counsel to listen to the recordings, says Clark, would not have caused a severe delay of the trial. The State responds that it had provided counsel with the parts that it intended to play at trial and that the rest was not relevant and was not used.

**{¶ 47}** The only jail call referred to at trial by the State was during its cross-examination of Huddleston and concerned a telephone conversation that she had had with Clark after the first day of trial discussing that day's testimony. None of the jail calls were actually played during the trial. But perhaps most interesting is the reason that the State had not discovered the calls sooner. According to the State, it only found the calls

when it later searched the jail's phone records for particular phone numbers. The calls did not show up when the State earlier searched the records using Clark's name because Clark had used another inmate's name to make the calls. Indeed, in the calls, the State said, Clark admits that he did this intentionally in an effort to hide evidence from the State.

**{¶ 48}** We cannot say that the trial court abused its discretion by denying Clark a continuance. And even if the court did err, Clark fails to show prejudice. He does not say what the recordings contain, let alone that they contain evidence that would have exonerated him. Moreover, Clark was a party to the conversations and would already have knowledge of what was said. Finally, if any of Clark's own statements during the phone conversions were potentially exculpatory, they would be inadmissible under Evid.R. 802. *State v. Beeson*, 2d Dist. Montgomery No. 19312, 2002–Ohio–4341, ¶ 56 ("Defendant's out-of-court exculpatory statement that he sought to introduce through the testimony of other witnesses was clearly offered to prove the truth of the matter asserted * * * and constitutes hearsay .").

**{¶ 49}** The sixth assignment of error is overruled.

### III. Conclusion

**{¶ 50}** We have overruled all of the assignments of error presented. The trial court's judgment is therefore affirmed.

. . . . . . . . . . . . .

WELBAUM, J., concurs.

DONOVAN, J., concurring in part and dissenting in part:

**{¶ 51}** In my view the language of the judgment entry of conviction is deficient. It lacks a finding pursuant to R.C. 2929.14(C)(4) that "at least two of the multiple offenses

were committed as part of one or more courses of conduct." This lack of course of conduct language, in my view, and the actual wording of the judgment entry, undermines any presumption of regularity. Thus, we have a dilemma on this record. Normally, a nunc pro tunc order would apply to reflect what actually occurred in open court. *See State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659. Because I cannot say what actually occurred, I would order the sentencing transcript be prepared before either remanding for a nunc pro tunc order, or reversing for lack of both oral findings and a sufficient judgment entry.

Copies mailed to:

Mathias H. Heck
Heather N. Jans
Travis Kane
Hon. Gregory F. Singer