[Cite as *State v. Burnett*, 2025-Ohio-1836.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,

      Plaintiff-Appellee,      :

                                  No.  114495

                             :

      v.

                             :

HALIMAH BURNETT,

                             :

      Defendant-Appellant.

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND VACATED
**RELEASED AND JOURNALIZED:** May 22, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No.  CR-24-692636-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Sarah Hutnik and Dominic Neville, Assistant Prosecuting Attorneys, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and Rick L. Ferrara, Assistant Public Defender, *for appellant.*

EMANUELLA D. GROVES, J.:

{¶ 1} Defendant-appellant Halimah Burnett ("Burnett") appeals her convictions for misuse of credit cards, theft, and theft from a person in a protected

class following a jury trial. Upon review, we reverse the judgment, vacate the conviction, and discharge Burnett.

## I. Facts and Procedural History

{¶ 2} In June 2024, Burnett was indicted in a three-count indictment for alleged fifth-degree-felony offenses that occurred on or about January through February 2024. Count 1 charged Burnett with misuse of credit cards and included a furthermore specification that the victim of the offense was an elderly person or disabled adult, and the violation involved less than a $1,000 value. Count 2 charged Burnett with theft and included a furthermore specification that the property stolen was a credit card. Count 3 charged Burnett with theft from a person in a protected class and included a furthermore specification that the victim of the offense was a disabled adult or active-duty service member or spouse. Burnett pleaded not guilty, and the matter proceeded to trial in September 2024.

{¶ 3} The following evidence was presented by the State. Mayfield Village Patrolman Steven Palka ("Officer Palka") received a report from Via Quest[1] Operations Manager Aaron Walker ("Walker") on February 20, 2024, regarding the misuse of a credit card. According to Officer Palka, Walker reported that fraudulent activity appeared on the checking account of one of his Via Quest clients ("the client"), who was autistic, nonverbal, and deaf. Officer Palka identified Burnett as the suspect without elaborating as to how she was identified. When Officer Palka

---

[1] Officer Palka described Via Quest as a "healthcare company that provides 24/7 healthcare needs [for] people with developmental disabilities." (Tr. 209.)

took Walker's report, he was given screenshots and the client's checking-account statements. The screenshots ("text-message receipt") documented a text message from Burnett to Walker with a receipt for an "authorized purchase" of groceries on January 14, 2024, totaling $90. (Tr. 211.) Burnett's text-message receipt confirmed that she placed the client's order on a Door Dash account and showed the items purchased as well as the total paid by the client — all of which were "approved." *Id.* at 211-213. In his independent review of the client's checking-account statements, Officer Palka noticed multiple additional Door Dash orders. Aside from taking Walker's report, Officer Palka was not otherwise involved in the investigation.

{¶ 4} Next, Walker offered testimony regarding Via Quest's operations, Burnett's Via Quest employment, and the circumstances surrounding his report to Officer Palka. Walker explained that in addition to other services, Via Quest provides the following financial assistance to individuals with developmental disabilities:

> So [clients] can ask — well, they work with a support administrator, somebody from the county, so if they don't have an understanding or the concept of money then they need a payee. So with Via Quest we offer that service also. So myself as operations manager, I can give directive[s] to management underneath me or to staff to say, hey, you know, here is a debit card or here's cash so that we can, you know, make sure that the clients have everything that they need in the house. We take care of all their bills. If they're paying rent anything that comes through as far as like [M]edicaid we take care of everything for the most part.

*Id.* at 222.

**{¶ 5}** Walker testified that he was one of the individuals responsible for the client's financials, including her debit card. Walker advised that the Via Quest manager or staff member in possession of the client's physical debit card was the only person authorized to use it, explaining:

> [W]hen an individual comes [to Via Quest] they do an assessment to see how they understand the concept of money. And you know, if they're not able to carry their debit card because they'll just swipe, swipe, swipe or somebody could take advantage of them so we hold on to the debit card and we'll put in their plan they might be able to hold ten dollars or cash per week and then we keep that ten dollars of cash on them and then anything else we keep up with all of these things and then we get permission to use the card once it hits [a] certain amount for like big purchases.

*Id.* at 225.

**{¶ 6}** Walker further testified that Burnett worked under him as a direct-support professional for Via Quest and had access to the client's debit card. Walker advised that Burnett was approved to use the debit card on one occasion after she volunteered to do the client's grocery shopping for him. Walker explained Via Quest's shopping process as follows:

> So usually staff or even myself will go into the home, we'll say, you know, they need groceries or even the client might say they need something they want that's not in the home, we didn't purchase this particular time they just need to do re-up on all their groceries.
>
> So we didn't give the card out to all of the staff because we don't want fraud to happen or cards get misplaced or different things like that. So if there's a staff that's been working at the site who's trained at the site who knows the individuals and what they like to eat, we'll allow them to go grocery shopping. So they'll [make] a list. I have — I had the staff do a list with the other staff and with the individuals to make sure that they are getting what they like to eat and what they want to take to their day program.

Once that list is done they'll let me know, hey, I'm about to go grocery shopping. I'll say, okay, make it an outing so that the individuals are participating. If it's a rough day the staff will do it on their own. This particular time it was done through Door Dash which we don't like Door Dash because we have to pay for fees and an unnecessary fee the clients have to pay so we rather our staff go to the store. But this particular time was Door Dashed. I'm not sure if the clients were having a bad day or it was just easier at the time. So the purchases get made, staff will let me know, you know, make the purchases, and then they'll send me a picture of the receipt to show that these are all the purchases and this is how much was spent.

Usually when I have enough time I'll go back to the site just to make sure that whatever was on the receipt matches what's in the home and then I turn in the receipts to my — well, I upload the receipts to a system that we use to do our audits. My boss will sign off on all the receipts. I match it with what was spent from the bank account and everything is signed off and then then we close it off for the whole entire month and then we re-up the debit card or bank account with the funds that are coming in from their benefits such as social security or something like that.

*Id*. at 226-228. Walker testified that he received a receipt from Burnett for the client's approved grocery purchase in January 2024 via text message. Burnett returned the client's debit card to Walker about a week and a half after the purchase was made. Walker confirmed that this delay was "normal," "[j]ust in case there w[ere] . . . different things that they still needed or stuff that they might have forgotten to buy." *Id*. at 233. After the client's debit card was returned to Walker, no other Via Quest employee had access or approval to use it; Walker testified that "[he] was the last person to have it." *Id*. at 235.

**{¶ 7}** After performing a monthly audit, Walker noticed that the client's account balance did not match Via Quest's records and requested a list of debit-card transactions from the client's bank. Walker explained:

> So an audit is done every month for their finances to make sure that everything balances out for like the next month. So with this particular card you have to call in to the bank and listen to the transactions to make sure that they match up to all of the receipts that we're already turning in our program. So when I called in there and heard that the balance didn't match what we had you are able to listen to the different transactions. So when I started listening to the transactions and comparing it to the receipts that I already had that were in our system they didn't match up. So then I reached out to the payee and I asked them to log into [the client's] personal bank account and to send me all of the transactions throughout a certain date and that's when we saw that there was fraudulent activity on her account.

*Id.* at 231-232.

**{¶ 8}** During his testimony, Walker reviewed the client's bank statements from January and February 2024. Walker testified that other than the $90 grocery purchase in January, the multiple other transactions listed were unauthorized by the client or Via Quest. Walker stated:

> And then that's when we, you know, asked did the clients want Door Dash, did you guys just not cook that day? And that's when we found out it was fraudulent activity and then, you know, I've seen this before, so we just sometimes people forget to take out the debit card when they are doing Door Dash or whatever mistake happen[ed]. But mistakes happen. And so that's when, you know, we're like, hey, we need to call this in. And because since I'm the manager, of course, you know, things fall on me also. You know, I don't want to look like I stole anything along with I don't want staff stealing money either. And then, you know, we're like maybe somebody dropped the card or maybe hackers, I've seen that happen plenty of times also. So after it was discovered where [the payee was] asking me we just need these receipts, turn them in, everything will balance out, we realized that it was fraudulent activity going on.

*Id.* at 236-237. Upon discovering the fraudulent activity, Walker cancelled the client's debit card, ordered a new one, and reported his findings to the police. Walker testified that Burnett was the last person to make an approved purchase on the card using her own Door Dash account since Via Quest does not have its own company account. Walker further testified that Burnett was not supposed to use Door Dash and was ultimately fired by Via Quest.

{¶ 9} On cross-examination, Walker testified that while Via Quest employees sometimes use Door Dash for various reasons when they cannot go to the store, he did not know Burnett was going to use Door Dash until after he received the receipt for the client's groceries. Walker explained that using Door Dash "[is] not unheard of but it's not recommended only because of the extra fees." *Id.* at 242. Walker advised that using Door Dash was not in violation of company policy and was not abnormal.

{¶ 10} Finally, Walker testified on cross-examination that he oversaw four different Via Quest sites, with one to four clients at each site and several Via Quest employees who would come and go each day. Employees used a tablet located at each site to check in and out, track their clients' needs, and take notes throughout the day.

{¶ 11} Next, Mayfield Village Police Detective Mark Justice ("Detective Justice") offered testimony about his investigation of the case. When Detective Justice was assigned to the case, he knew that Burnett worked at Via Quest and the victim was Via Quest's client based on Officer Palka's report. Detective Justice sent

a subpoena to Door Dash to obtain information about the fraudulent transactions and the account used to make them. In response, Detective Justice received details from the Door Dash account's January and February transactions, including the dates, times, IP addresses, costs, items, suppliers, and delivery addresses associated with each order. Detective Justice compared the totals listed in Door Dash's subpoena response to the transactions listed in the client's checking-account statements and "the dollar amounts matched exactly . . . [t]o the penny." *Id.* at 269.

{¶ 12} During his review of Door Dash's subpoena response, Detective Justice noticed that the first January order was for the client's authorized grocery purchase. The items and total from the Door Dash records matched the text-message receipt and checking-account statements provided to him at the onset of his investigation. While cross-referencing these documents, Detective Justice matched around 40 transactions, totaling "$758 and some change." *Id.* at 270. There were also a few Door Dash orders that were not charged to the client's debit card. Once the client's debit card was cancelled, no further orders were placed. Detective Justice explained that while the authorized grocery purchase was delivered to the client's address, none of the other transactions were delivered there. Other deliveries were made to eight other addresses, one being on Falkirk Road.

{¶ 13} According to Detective Justice, Door Dash's subpoena response also included the account's subscriber information. The name or social media handle associated with the account was "short[ii] bop," the email address linked to the account was "short[ii] bop at iCloud[.com]," and the subscriber's address was listed

as a Cleveland family shelter. *Id*. at 265-266. Detective Justice testified that the "shortii bop" account was listed on the text-message receipt. Detective Justice called the phone number listed on the account, a female answered, and Detective Justice asked for "the person who was suspect at the time[,] Halimah Burnett." *Id*. at 266. Detective Justice testified, "She said I was speaking to her." *Id*. at 267. Detective Justice explained that he tried to set up an appointment with Burnett, but she did not come in to speak with him:

> The day I did call her and she answered and identified herself I advised her the reason I was calling of these fraudulent purchases on a person's card and she immediately denied it. And I asked her, well, could you come in and let's discuss, show you what I have, can you explain to me, you know, what other actions are whatever, possibilities could be that these are occurring? She said she would be in the following Monday at 10:00 a.m. and she never came in, never called back.

*Id*. at 288-289.

{¶ 14} On cross-examination, Detective Justice admitted that he never spoke with Walker directly and had no firsthand knowledge regarding the reported fraudulent transactions; rather, he based his knowledge on the information given by Walker to Officer Palka. Detective Justice further admitted that he never visited or verified any of the delivery addresses to determine what they were, who resided there, or whether surveillance footage of the deliveries was available. Detective Justice advised that none of the delivery addresses matched Burnett's driver's license information. Detective Justice did not believe that any of the addresses were associated with Via Quest or that Burnett would be working at those addresses.

{¶ 15} Detective Justice further testified on cross-examination that he did not investigate the tablets located at each Via Quest site. Although Detective Justice received a list of about eight other Via Quest employees that worked with the client, he did not talk to them or look up their addresses. Nor did Detective Justice follow up on the orders purchased with another payment method or the names associated with those credit cards. Detective Justice did not follow up with Door Dash to ascertain when the "shortii bop" account was created or investigate the IP addresses associated with each transaction. Nor did Detective Justice obtain search warrants for the "shortii bop" email account or Burnett's cell phone.

{¶ 16} The State rested and the following exhibits were admitted into evidence without objection: the text-message receipt; the client's January and February checking-account statements; the subpoena propounded on Door Dash; and Door Dash's certified subpoena responses. Burnett moved for acquittal on all counts under Crim.R. 29. The trial court denied Burnett's motion.

{¶ 17} Burnett then offered testimony in her own defense. Burnett testified that she worked for Via Quest as a direct support professional, providing care for disabled adults who required services 24 hours per day and 7 days a week. Burnett explained that she worked at two of Via Quest's several locations: one on Aintree Park Drive ("Aintree"), where the client lived, and the other on Falkirk Road ("Falkirk"). She worked for three clients at each location. Ideally, five or six caretakers worked at Falkirk per shift, with three shifts per day, and four worked at Aintree per shift. The Via Quest workers would switch after each shift and some

caretakers worked at both locations. The Via Quest workers tracked their daily responsibilities and tasks with a tablet in each location. The tablets did not have a passcode and were connected to the internet. Burnett explained, "All workers that worked with the people that we care[d] for" had access to the tablets. *Id.* at 340.

{¶ 18} Burnett also offered testimony about the circumstances surrounding January 14, 2024. Burnett recalled that she worked at Aintree that day with one other Via Quest worker due to a staffing shortage. They relieved three workers from the prior shift. Burnett explained that the clients had nothing to eat, and she was told to place an order by a supervisor. Burnett refuted Walker's testimony that placing a Door Dash order was her suggestion, advising "that was his suggestion" since he was unable to come in and the Aintree location was short-staffed that day. *Id.* at 342. Burnett explained that Walker did not physically hand her the client's debit card; rather, the card was kept in an unlocked file cabinet at the Aintree location.

{¶ 19} Burnett advised that she was directed to use the client's card to buy groceries from Door Dash. Because she did not have a Door Dash account, Burnett created one on the tablet "that we all use." *Id.* at 344. Burnett testified that she used the tablet, and not her personal cell phone, "because it was the client's information and things of that nature." *Id.* at 345. Burnett explained that the Door Dash account had to be confirmed via email, so she used the email address linked to her cell phone: shortiibop@icloud.com. Burnett advised that she "never really used that e-mail for anything," did not frequently check her inbox, and created it only so she could use

certain features on her cell phone. *Id.* at 347. Burnett also testified that she did not go by the name "shortii bop," it was "just something [she] made up to create the email address." *Id.* at 350. Burnett never downloaded the Door Dash application on her personal cell phone; she only downloaded it onto the tablet at the client's home.

{¶ 20} After Burnett downloaded the Door Dash application on the tablet and created an account, she discussed the items to be purchased with other workers and placed an order with the nearest grocery store. Burnett testified that she received a receipt via email ("email receipt") and sent it to Walker. Burnett did not sign out of the Door Dash application on the tablet after placing the order and never re-accessed the account. Burnett testified that at least ten different Via Quest workers had access to the Aintree tablet each day.

{¶ 21} After making the grocery purchase, Burnett placed the client's debit card back in the file cabinet. Burnett denied retaining control and possession of the debit card after she made the Door Dash order. Burnett further testified that Walker did not observe her returning the client's debit card to the file cabinet since he did not visit the Aintree location that day. Burnett claimed that she only saw Walker come to the Via Quest's facilities on two occasions and he would not regularly check up on her or the client's debit card in the file cabinet.

{¶ 22} Burnett reviewed Door Dash's subpoena response and testified that of the eight delivery addresses, she recognized only two: Aintree and Falkirk. Burnett was unfamiliar with the other delivery addresses and had never lived at or visited

those locations.  Burnett denied making any other purchases from Door Dash after the authorized grocery purchase on January 14, 2024.  Burnett testified, "That was the first and only purchase I made."  *Id.* at 359.  Burnett further testified that she was aware of other fraudulent activity occurring at Via Quest: "[W]hen I first started the supervisor at Falkirk was fired I guess for some type of theft involvement . . . ." *Id.*

{¶ 23} On cross-examination and over the objection of defense counsel, Burnett testified that she did not speak with Detective Justice and did not recall receiving a telephone call from him.  Burnett testified that she got a new cell phone, without access to the "shortii bop" email address, and new phone number in February 2024.  Burnett confirmed that the phone number Detective Justice called in April 2024 was hers but repeatedly stated that she did not remember being contacted by a detective.  Burnett testified that she was "unaware of any investigation" and was advised "not to speak or say anything" after she was charged. *Id.* at 363.  Burnett reiterated that she never took the client's debit card from Aintree, Walker's testimony was untrue, and "fraudulent things [were] going on before [she] ever arrived."  *Id.* at 366.  Burnett repeatedly stated that while she created the "shortii bop" Door Dash account, she only used Door Dash on one occasion: to place the authorized grocery order.  Burnett testified, "That's the only transaction I made." *Id.* at 368.  Burnett did not check her email after she made the Door Dash account and sent the email receipt to Walker.

{¶ 24} The State also inquired into Burnett's firing from Via Quest on cross-examination. Burnett testified that she was not investigated by or fired from Via Quest as a result of the fraudulent Door Dash transactions. Rather, she was fired for not having a valid driver's license, which was required to work at Aintree and Falkirk. Burnett advised that she was fired in January and began working in the Cleveland Clinic's surgery department in February. The following discussion then occurred:

> [STATE:] So you weren't even working at Via Quest —
>
> [BURNETT:] No, sir.
>
> [STATE:] — during these transactions?
>
> [BURNETT:] No. I was — a lot of them, no, I was not there.
>
> . . .
>
> [STATE:] So you weren't just ordering lunch for yourself while you were working?
>
> [BURNETT:] No. Like I said, I was terminated the next week so some of these orders were made when I wasn't there.

*Id.* at 371, 381.

{¶ 25} Following her testimony, Burnett rested, admitted the email receipt as an exhibit without objection, and renewed her Crim.R. 29 motion for acquittal. The trial court denied the motion. After closing arguments, the trial court charged the jury and deliberations began.

{¶ 26} The next morning, the jury advised the trial court that it could not reach a unanimous verdict, and the trial court provided a further *Howard*-charge

instruction.[2] Later that day, the jury returned guilty verdicts on Counts 1 through 3 as charged in the indictment. The trial court subsequently sentenced Burnett to "1 year of community control/probation on each count, under the supervision of the adult probation department" and "10 days in county jail [to be served] on . . . consecutive weekends . . . ." (Sentencing Entry, Oct. 16, 2024.) Burnett was furthered ordered to pay a $1,000 fine in addition to court costs and supervision fees.

{¶ 27} Burnett appeals, raising three assignments of error for review.

### Assignment of Error No. 1

Insufficient evidence supported Burnett's convictions.

### Assignment of Error No. 2

[Burnett's] convictions were not supported by the manifest weight of the evidence.

### Assignment of Error No. 3

Each conviction produced in the instant case should have merged as allied to the others.

Because it is dispositive, we address Burnett's first assignment of error only.

## II. Law and Analysis

{¶ 28} As an initial matter, we address a troubling counterargument raised in the State's appellate briefing. The State claims that Burnett "never followed up"

---

[2] "A *Howard* charge reminds deadlocked jurors that their duty is to decide the case if they can conscientiously do so" and "challenges them to try a final time to reach consensus." *Jones v. Cleveland Clinic Found.*, 2020-Ohio-3780, ¶ 25; *State v. Howard*, 42 Ohio St.3d 18 (1989).

with Detective Justice and "[a]n innocent person would, at minimum, try her best to retain her reputation and avoid criminal charges." The State further argues that Burnett "could have easily cleared her name" and "refrained from clarifying that she was innocent of the crimes of which she was accused." To the extent that the State asserts that defendants have some duty or obligation to prove their innocence, we note, as did Burnett, that the burden of proving defendants' guilt beyond a reasonable doubt lies squarely with the State. *In re Winship*, 397 U.S. 358, 361-364 (1970) (explaining the long-standing history of the government's burden-of-proof, describing the "vital role [the reasonable-doubt standard plays] in the American scheme of criminal procedure," and "explicitly hold[ing] that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); R.C. 2901.05(A) ("Every person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution."). With that well-established principle of American jurisprudence in mind, we turn to Burnett's first assignment of error.

{¶ 29} In her first assignment of error, Burnett argues that the State failed to present sufficient evidence of identity. Burnett claims that the State did not present any evidence proving that she caused or maintained the benefits of the unauthorized charges to the client's account. Burnett does not identify any element that the State failed to prove other than identity. Because Burnett does not contend that the State failed to establish any of the other elements of the crimes for which she was

convicted, we limit our analysis to whether the evidence was sufficient to establish, beyond a reasonable doubt, that Burnett was the perpetrator.

{¶ 30} A challenge to the sufficiency of the evidence supporting a conviction requires a reviewing court to determine whether the State has met its burden of production at trial. *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997). When reviewing a sufficiency challenge, an appellate court "examine[s] the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶ 31} During its review, the appellate court does not assess whether the State's evidence is to be believed, "but whether, if believed, the evidence against a defendant would support a conviction." *Thompkins* at 390. Indeed, when evaluating evidence's sufficiency, a reviewing court does not contemplate witness credibility or weigh the evidence; rather, "the reviewing court assumes that witnesses testified truthfully and evaluates whether that testimony, along with any other direct or circumstantial evidence presented at trial, satisfies each element of the offense." *State v. Haskins*, 2024-Ohio-5908, ¶ 37 (8th Dist.), citing *State v Young*, 2022-Ohio-3132, ¶ 47 (8th Dist.), and *Cleveland v. Clark*, 2024-Ohio-4491,

¶ 37, 39 (8th Dist.) (noting that a challenge to the sufficiency of the evidence presents a question of law, not fact).

{¶ 32} "'It is well settled that in order to support a conviction, the evidence must establish beyond a reasonable doubt the identity of the defendant as the person who actually committed the crime at issue.'" *State v. Missler*, 2015-Ohio-1076, ¶ 13 (3d Dist.), quoting *State v. Johnson*, 2014-Ohio-1226, ¶ 27 (7th Dist.), citing *State v. Collins*, 2013-Ohio-488, ¶ 19 (8th Dist.), and *State v. Lawwill*, 2008-Ohio-3592, ¶ 11 (12th Dist.). Like any other element of an offense, identity must be proved by the State and may be established through direct or circumstantial evidence. *State v. Lauer*, 2023-Ohio-1076, ¶ 8 (9th Dist.), citing *State v. Jackson*, 2017-Ohio-635, ¶ 7 (9th Dist.).

{¶ 33} Our review of the record reveals that the State presented insufficient evidence that Burnett perpetrated the crimes charged. In fact, the evidence presented fails to rise beyond mere speculation. It appears that because Burnett created the account and made the authorized Door Dash purchase, it was simply assumed she made the subsequent unauthorized purchases.

{¶ 34} During the State's case-in-chief, Officer Palka offered testimony about the fraudulent-activity report he received from Walker. Officer Palka identified Burnett as a suspect, seemingly because she made the authorized Door Dash purchase. Officer Palka testified:

[STATE:] And were you able to look into those purchases or come up with a suspect for that fraudulent activity?

[OFFICER PALKA:] Yes.

[STATE:] And who was that suspect?

[OFFICER PALKA:] Halimah Burnett.

[STATE:] Did you do anything else in respect to the investigation other than take the report?

[OFFICER PALKA:] No.

. . .

[STATE:] Officer, just briefly, when you took this report were you given any other information pertaining to Miss Burnett's involvement?

[OFFICER PALKA:] I was given a copy of [the client's] January, 2024 screen shot for her — on her checking account and then a copy of screen shots for [the  ]authorized purchase that was used on her account for Door Dash. . . . It is an authorized purchase that Mr. Walker allowed Miss Burnett to purchase on her Door Dash account for [the client] for groceries for $90.

(Tr. 209-211.)

{¶ 35} Next, Walker offered testimony regarding Via Quest's operations, Burnett's Via Quest employment, and the circumstances surrounding his report to Officer Palka.  Walker testified that Burnett was permitted to make one approved grocery purchase using the client's debit.  Walker testified that Burnett sent him a text-message receipt for the transaction and returned the client's debit card.  Walker further testified that Burnett was the last person to make an approved purchase on the card using her own Door Dash account since Via Quest does not have its own company account.  While Walker advised that using Door Dash was "not

recommended only because of the extra fees," it was not in violation of Via Quest's policies nor abnormal.

{¶ 36} Finally, Detective Justice offered testimony regarding his investigation of the case. Detective Justice testified that Burnett worked at Via Quest and the victim was Via Quest's client based on Officer Palka's report. Detective Justice sent a subpoena to Door Dash to obtain information about the fraudulent transactions and the account used to make them. Detective Justice's investigation involved analyzing Door Dash's subpoena response, comparing the transactions and account information listed therein to the client's checking-account statements and text-message receipt received by Officer Palka, and calling the phone number listed on the "shortii bop" account. Detective Justice testified that Burnett answered the phone and denied her involvement but never came in to speak with him.

{¶ 37} On cross-examination, Detective Justice conceded that he never spoke to Walker, had no firsthand knowledge regarding the reported fraudulent transactions, never visited or verified the orders' delivery addresses, did not attempt to obtain surveillance footage, never investigated the Via Quest tablets or employees, did not follow up on orders purchased with other payment methods, never followed up with Door Dash to determine when the "shortii bop" account was created, did not investigate the IP addresses associated with the fraudulent transactions, and never obtained search warrants for the "shortii bop" email account or Burnett's cell phone.

{¶ 38} The evidence presented by the State stands in stark contrast to the evidence presented in *State v. Ryan*, 2018-Ohio-4739 (5th Dist.). There, the

defendant appealed his convictions for pandering obscenity and sexually oriented material involving a minor. The defendant argued that the State failed to prove that he was the person who downloaded and possessed the material found on his computer or hard drive. *Id*. at ¶ 53. In its sufficiency assessment, the Fifth District noted that the State presented evidence that the materials were downloaded on a computer or hard drive in the defendant's home and emailed to and from the defendant's email addresses. *Id*. at ¶ 54. Surveillance revealed that the defendant was the only person entering or leaving his home and the residence did not have an unsecure Wi-Fi connection. *Id*. Moreover, mail addressed only to the defendant was found on the desk where the computer was located, and intimate items were found in the desk's drawer. *Id*. Testimony was also offered that the case's circumstantial evidence pointed to the defendant as the perpetrator. *Id*. at ¶ 55. This evidence included: a file attached to a flagged email that was located on the computer; images that were backed up to the hard drive; materials that were downloaded over a period of years; files that existed on the computer for six months to a year prior to seizure; photographs of the defendant sitting at the desk using the computer; and a search of the defendant's cell phone, revealing that he conducted an online search for the definition of "pandering" and information regarding how to delete past searches and internet activity. *Id*. Ultimately, the Fifth District held that the evidence presented by the State was sufficient, if believed by the jury, to find that the defendant was the perpetrator of the crimes charged. *Id*. at ¶ 56.

{¶ 39} Unlike *Ryan*, little to no investigative methods were taken in Burnett's case to prove identity. At most, the evidence presented by the State establishes that Burnett had opportunity to commit the crimes charged: she created the "shortii bop" Door Dash account from which the unauthorized purchases were made using her email address and phone number and had access to the client's debit card and Via Quest's tablets. However, opportunity alone does not amount to proof beyond a reasonable doubt that Burnett was the perpetrator of the crimes charged; indeed, none of the evidence established that Burnett was the only individual with such access and opportunity.

{¶ 40} Rather, evidence was presented that numerous Via Quest employees worked at Aintree and Falkirk and had access to the tablets at each location. Burnett testified that she did not sign out of the Door Dash application and no testimony was offered that the account's password was not otherwise saved or stored in the Via-Quest-community tablets. None of the evidence linked the IP and delivery addresses listed in Door Dash's subpoena response to Burnett. Nor did the evidence establish which devices were used to make the unauthorized Door Dash purchases or to whom the deliveries were made. While the defense noted that some deliveries were made to Aintree and Falkirk, the delivery addresses and recipients were otherwise uninvestigated.

{¶ 41} Evidence otherwise linking Burnett to the fraudulent transactions is also absent from the record. No evidence was presented suggesting that Burnett was "caught in the act" making the unauthorized purchases or receiving the unapproved

goods. While Burnett admitted that she created the Door Dash account from which the unauthorized purchases were made, she did not confess to making any of the fraudulent transactions; rather, she continuously denied using Door Dash for anything other than the single, authorized, grocery order. Burnett testified that she returned the client's debit card; did not have the Door Dash application on her cell phone; and only used Door Dash once, when she created the "shortii bop" account and made the approved grocery purchase on Aintree's tablet. Burnett advised that she could not recall speaking to a detective, was unaware of any investigation, and was advised not speak to law enforcement after she was charged. Burnett further testified that she was personally aware of other fraudulent activity occurring at Via Quest.[3] Finally, evidence was presented that some of the unauthorized orders were placed after Burnett was fired from Via Quest for unrelated reasons.

{¶ 42} Viewing this evidence in a light most favorable to the prosecution, we cannot say that any rational trier of fact could have found that Burnett's identity was proven beyond a reasonable doubt. Accordingly, Burnett's first assignment of error is sustained and the second and third assignments of error are rendered moot.

{¶ 43} Judgment reversed, conviction vacated, and defendant discharged.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

---

[3] The State did not object to nor further explore or counter this testimony.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, JUDGE

EILEEN A. GALLAGHER, A.J., and
DEENA R. CALABRESE, J., CONCUR